[No. A048198. First Dist., Div. Four. May 9, 1990.]

JOHN COE, Petitioner, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF
SAN FRANCISCO, Respondent;
IRWIN MEMORIAL BLOOD BANK, Real Party in Interest.

MARY PINEDO et al., Petitioners, v.
THE SUPERIOR COURT OF THE CITY AND COUNTY OF
SAN FRANCISCO, Respondent;
IRWIN MEMORIAL BLOOD BANK, Real Party in Interest.

**COUNSEL**

Cartwright, Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris, Robert U. Bokelman, Anglia S. Benjamin, Meis & Waite, Fred G. Meis and Sarah Jane Burgess for Petitioners.

No appearance for Respondent.

O'Connor, Cohn, Dillon & Barr, Duncan Barr, Lisa T. Ungerer, Charles Bond and Stephanie Y. Gandolfi for Real Party in Interest.

Hassard, Bonnington, Rogers & Huber, David E. Willett, Horvitz & Levy and S. Thomas Todd as Amici Curiae on behalf of Real Party in Interest.

OPINION

**PERLEY, J.**—In this complex litigation we issued an alternative writ to inquire whether the Medical Injury Compensation Reform Act (MICRA) applies to Irwin Memorial Blood Bank. We agree with respondent court that it does and, accordingly, deny the petition and discharge our alternative writ.

Petitioners are plaintiffs in two actions against Irwin Memorial Blood Bank (Irwin), real party in interest herein. The actions come within the complex blood bank litigation which includes "all litigation currently pending and hereafter filed in the San Francisco Superior Court involving actions for damages for injury, wrongful death, and/or loss of consortium, allegedly arising out of the receipt and transfusion of AIDS tainted blood, or blood plasma, wherein it is alleged that Irwin Memorial Blood Bank is liable for said damages . . ." (See § 19, Cal. Standards Jud. Admin.)

On September 1, 1989, plaintiffs in the complex blood bank litigation moved for general order No. 2 on the issue of whether MICRA limitations are applicable to Irwin. On November 1, 1989, respondent court found that Irwin is a "health care provider" as defined by MICRA and that, thus, the limitations of that legislation are applicable to Irwin. We issued our alternative writ to review this issue of first impression.

In 1975, the Legislature enacted MICRA which, among other things, revised a number of legal rules applicable to professional negligence actions against health care providers. (See MICRA, Stats. 1975, Second Ex. Sess. 1975-1976, chs. 1, 2, pp. 3949-4007.) The legislative definition used uniformly in all relevant sections reads as follows: " 'Health care provider' means any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, or licensed pursuant to the Osteopathic Initiative Act, or the Chiropractic Initiative Act, or licensed pursuant to Chapter 2.5 (commencing with Section 1440) of Division 2 of the Health and Safety Code; and any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code. 'Health care provider' includes the legal representatives of a health care provider." (Bus. & Prof. Code, § 6146, subd. (c)(2); Civ. Code, §§ 3333.1, subd. (c)(1), 3333.2, subd. (c)(1); Code Civ. Proc., §§ 340.5, subd. (1), 364, subd. (f)(1), 667.7, subd. (e)(3), 1295, subd. (g)(1).)

Irwin holds licenses under both division 2 of the Business and Professions Code and division 2 of the Health and Safety Code. Under the Business and Professions Code, Irwin is licensed as a clinical laboratory. Petitioners

contend that Irwin's activities which gave rise to the allegations of professional negligence are not those within the scope of services for which it is licensed as a clinical laboratory and therefore its licensure under division 2 of the Business and Professions Code is irrelevant.[1] Rather, petitioners take the position that the activities which have given rise to the allegations of professional negligence are within the scope of Irwin's licenses under division 2 of the Health and Safety Code. Petitioners point out that the definition of "health care provider" under MICRA does not include *any* organization licensed under division 2 of the Health and Safety Code but only "any clinic, health dispensary, or health facility" licensed under that division. Petitioners contend that Irwin is neither a "clinic," a "health dispensary," nor a "health facility." Therefore its licensure under division 2 of the Health and Safety Code does not make Irwin a "health care provider" within MICRA.

The terms "clinic" and "health facility" are defined in division 2 of the Health and Safety Code. This division, entitled "Licensing Provisions," defines clinics in section 1200 et seq. and health facility in section 1250. It is undisputed that Irwin does not fall within these definitions. There is no definition of "health dispensary" in the Health and Safety Code nor was there a definition of the term in 1975 when the provisions of MICRA were enacted. However, petitioners point out that in 1975, chapter 1 of division 2 was entitled "Clinics and Dispensaries" and that MICRA's definition of "health care provider" has not been amended since its passage. Petitioners would look to the definitions in chapter 1 of division 2 as it read in 1975 to determine the Legislature's intention in using the term "health dispensary." Since "health dispensary" was not separately defined, and since the term "dispensary" was used within the definition of "clinic," petitioners would confine the term "health dispensary" to institutions falling within chapter 1 of division 2 as it read in 1975.[2] Since blood banks were not licensed in

[1] A clinical laboratory, licensed pursuant to chapter 3, division 2 of the Business and Professions Code is defined in section 1206, subdivision (a)(3), of that chapter as: "[A]ny place used, or any establishment or institution organized or operated, for the practical application of the clinical laboratory sciences. That application may include any means which applies the clinical laboratory sciences."

Business and Professions Code section 1206, subdivision (a)(1), states: " 'Clinical laboratory sciences' means those scientific disciplines which relate to the examination (which includes detection, identification, measurement, or enumeration of any particular entity or substance) of biological specimens; and the evaluation, correlation, monitoring, and reporting of the results of an examination of biological specimens, for the purpose of obtaining scientific data which may be used as an aid to ascertain the presence, progress, and source of a disease or physiological condition in a human being or used as an aid in the prevention, prognosis, monitoring, or treatment of a physiological or pathological condition in a human being."

[2] Former Health and Safety Code section 1202 (repealed Stats. 1978, ch. 1147, § 3, p. 3517) read, in pertinent part: "As used in this chapter 'clinic' means any place, establishment, or institution which operates under the name or title of clinic, *dispensary,* health center, medical

chapter 1 and since blood banks cannot reasonably be considered to fall within the definition of clinics, petitioners reason that the Legislature did not intend to include blood banks as a health care provider under its licenses pursuant to the Health and Safety Code.

Respondent court was not persuaded by the above reasoning but concluded: "The inclusion of the entirety of division 2 of the Health & Safety Code seems to be coterminous with the actions of the Legislature in dealing with the medical malpractice problem. The commentators indicate that the legislative intent was to take a comprehensive approach to resolve the problem, and a 'health dispensary' logically includes the operations of a blood bank."

We are of the opinion that respondent court's expansive view is consonant with the legislative history of MICRA and are persuaded by Irwin's interpretation of that history. The Legislature's original definition of "health care provider" in the first draft of MICRA dated May 19, 1975, specified blood banks by name. As the statute was amended, the Legislature abandoned efforts to list health providers by name in favor of listing by licenses. For example, an amendment (dated June 11, 1975) to MICRA attempted to list with specificity the providers affected by a limitation on contingency fees, i.e., "physician and surgeon, dentist, registered nurse, dispensing optician, optometrist, registered physical therapist, podiatrist, licensed psychologist, osteopath, chiropractor, clinical laboratory bioanalyst, clinical laboratory technologist . . . ." Ultimately, the Legislature abandoned the list concept and adopted the definition of "health care provider" by reference to the code divisions covering the licensing of the various providers. As Irwin points out, the reference to the divisions of the codes not only simplified the statutory reference but also provided for the evolution of health care professions and organizations. New categories of providers could be automatically covered by MICRA simply by regulating them within the same statutory scheme as other health care providers.[3]

"Health dispensary" was never defined within division 2 of the Health and Safety Code. Reference to "dispensary" within the title of division 2 in 1975 or within the definition of "clinic" is not a definition of "health dispen-

center, or any other word or phrase of like or similar import, either independently or in connection with any other purpose, for the purposes of furnishing at the place, establishment, or institution, advice, diagnosis, treatment, appliances, or apparatus, to persons not residing or confined in the place, establishment, or institution, and who are afflicted with bodily or mental disease or injury." (Stats. 1953, ch. 1098, § 2, p. 2590, italics added.)

[3] Irwin refers us to the example of the Home Dialysis Agency as a newly evolved provider regulated for the first time in 1989. (Health & Saf. Code, § 1794.01 et seq.) There would be no logical basis for distinguishing between those who provide dialysis in a hospital or clinic setting and those who provide the same in the patient's home; the health care provided is the same.

sary." Petitioners' analysis of the definition of health care provider would erase any distinction between a "clinic" and a "health dispensary" and would render the latter reference surplusage.

■ As the Supreme Court stated in *J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 36-37 [160 Cal.Rptr. 710, 603 P.2d 1306]: "A cardinal rule of construction is that . . . a construction making some words surplusage is to be avoided. [Citation.] . . . If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose. [Citation]; a construction making some words surplusage is to be avoided. [Citation.] When used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear. [Citations.] . . ." (Internal quotation marks omitted.)

■ We conclude that MICRA's application to those licensed under division 2 of the Health and Safety Code is not limited to clinics and medical facilities. "Health dispensary" is a separate category which includes blood banks since a blood bank dispenses a product and provides a service inextricably identified with the health of humans.[4]

The inclusion of blood banks as "health care providers" is entirely consistent with the legislative purpose in enacting MICRA which was to provide a remedy for the health care crisis attributable to malpractice premium costs.[5]

Given our conclusion that MICRA applies to Irwin in this case because Irwin is a "health dispensary" licensed pursuant to division 2 of the Health and Safety Code, we need not consider whether MICRA would also apply in this case because of Irwin's license as a clinical laboratory pursuant to division 2 of the Business and Professions Code.

---

[4] "Blood bank" is defined within division 2 of the Health and Safety Code as "any place where human whole blood, and human whole blood derivatives specified by regulation, are collected, prepared, tested, processed, or stored, or from which human whole blood or human whole blood derivatives specified by regulation are distributed." (Health & Saf. Code, § 1600.2.)

[5] In enacting MICRA, the Legislature made the following express finding: "(b) The Legislature finds and declares that there is a major health care crisis in the State of California attributable to skyrocketing malpractice premium costs and resulting in a potential breakdown of the health delivery system, severe hardships for the medically indigent, a denial of access for the economically marginal, and depletion of physicians such as to substantially worsen the quality of health care available to citizens of this state. The Legislature, acting within the scope of its police powers, finds the statutory remedy herein provided is intended to provide an adequate and reasonable remedy within the limits of what the foregoing public health and safety considerations permit now and into the foreseeable future." (Stats. 1975, Second Ex. Sess. 1975-1976, ch. 2, § 12.5, p. 4007.)

The petition for writ of mandate is denied and the alternative writ is discharged.

Anderson, P. J., and Channell, J., concurred.

Petitioners' application for review by the Supreme Court was denied July 25, 1990. Broussard, J., was of the opinion that the application should be granted.