[No. B155896. Second Dist., Div. Two. Aug. 30, 2002.]

DIANE L. JOHNSON et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
CALIFORNIA CRYOBANK, INC., et al., Real Parties in Interest.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.C.

## COUNSEL

Farnell & Norman, R. Richard Farnell and Margaret Kathryn Maas for Petitioners.

No appearance for Respondent.

Lewis, D'Amato, Brisbois & Bisgaard, Timothy R. Graves and Judith M. Tishkoff for Real Party in Interest California Cryobank, Inc.

Bonne, Bridges, Mueller, O'Keefe & Nichols, Mark B. Connely and Vangi M. Johnson for Real Party in Interest Charles A. Sims.

LaFollette, Johnson, DeHaas, Fesler, Silberberg & Ames, Louis H. DeHaas, Gillian N. Pluma and David J. Ozeran for Real Party in Interest Cappy Rothman.

**OPINION**

**NOTT, J.—**

### I. INTRODUCTION

Petitioners Diane L. Johnson (Diane) and Ronald G. Johnson (Ronald) (the Johnsons), along with their minor daughter Brittany L. Johnson (Brittany), filed an action against real party in interest, California Cryobank, Inc. (Cryobank), and its employees, officers and directors, real parties in interest Charles A. Sims, M.D. and Cappy M. Rothman, M.D., alleging real parties failed to disclose that the sperm they sold to the Johnsons came from a donor with a history of kidney disease called autosomal dominant polycystic kidney disease (ADPKD). That sperm was used to conceive Brittany, who has been diagnosed to have this serious kidney disease. In 1999, the trial court ruled in connection with a summary adjudication motion brought by Cryobank that Brittany is not entitled to recover general damages and damages for lost earnings. In that same year, the court granted motions brought by Sims and Rothman for summary adjudication as to the fraud causes of action set forth in petitioners' second amended complaint.[1] In 2001, petitioners filed motions to reconsider or vacate the 1999 rulings and to amend their complaint to add a claim for punitive damages. In November 2001, the trial court denied the motion to set aside the 1999 rulings. The following month, the court denied the motion for leave to amend petitioners' second amended complaint to add a claim for punitive damages without prejudice to the filing of a motion pursuant to Code of Civil Procedure section 425.13, subdivision (a).[2]

The issues presented in connection with this writ proceeding are whether (1) sperm banks such as Cryobank are "health care providers" as that term is used in section 425.13, subdivision (b), (2) doctors such as Sims and Rothman and sperm banks such as Cryobank act as health care providers when they perform genetic screening of potential sperm donors, (3) an individual complaining that negligent screening of a donor's sperm caused her genetic disability is entitled to recover damages for lost earnings and general damages, and (4) the trial court erred in denying petitioners' motion

---

[1] Judge Linda K. Lefkowitz issued the 1999 summary adjudication rulings.
[2] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

to set aside the 1999 orders summarily adjudicating the fraud causes of action asserted against Sims and Rothman.[3]

We conclude that Cryobank is a health care provider as that term is used in section 425.13, subdivision (b); Sims, Rothman and Cryobank were acting as health care providers at the time they performed the professional services alleged within the second amended complaint; and Brittany is not entitled to recover general damages or damages for lost earnings.

## II. FACTUAL AND PROCEDURAL BACKGROUND

*Second Amended Complaint.*

Petitioners sued Cryobank, Sims and Rothman for professional negligence, fraud and breach of contract. In their second amended complaint petitioners allege that in 1986 Cryobank, a corporation in the business of providing sperm from donors to health care providers and their clients, approved an individual designated as Donor No. 276 as a sperm donor.[4] In 1988, the Johnsons' infertility physician directed them to Cryobank's sperm bank facility, and Diane selected Donor No. 276. After a successful implant procedure with sperm from Donor No. 276, Brittany was born in April 1989. In May 1995, Brittany was positively diagnosed with ADPKD. As neither Ronald nor Diane has ADPKD or a family history of the disease, it was Donor No. 276 who genetically transmitted ADPKD to Brittany.

At the time Donor No. 276 approached Cryobank in December 1986, Sims and Rothman, on behalf of Cryobank, interviewed him and learned facts that signaled the presence of ADPKD in Donor No. 276's family. Even though Cryobank, Sims and Rothman knew of Donor No. 276's family history of kidney disease, none of this information was provided to the Johnsons at or prior to the time they purchased the sperm specimens.

Cryobank, Sims and Rothman failed to examine or test Donor No. 276 to ascertain whether he was suffering from kidney disease or was a potential carrier of the ADPKD gene, failed to properly investigate Donor No. 276's family history of kidney disease, and falsely represented to the Johnsons that the sperm they were purchasing had been tested and screened for infectious and "reasonably detectable genetically transferred" diseases and medical abnormalities, and therefore could safely be used to effectuate the Johnsons' pregnancy.

---

[3] We deal with this issue in the unpublished portion of this opinion.

[4] Cryobank's responses to interrogatories indicated that Donor No. 276 sold 320 deposits of his semen to Cryobank. The donor's agreement with Cryobank showed that he earned about $35 per semen specimen. He thus received a total of $11,200 for his sperm. (*Johnson v. Superior Court* (2000) 80 Cal.App.4th 1050, 1058 [95 Cal.Rptr.2d 864] (*Johnson*).)

*1999 Trial Court Rulings.*

The fraud causes of action set forth in petitioners' second amended complaint were based on the theory that Sims and Rothman either negligently or intentionally misrepresented, suppressed and/or concealed facts from the Johnsons regarding Donor No. 276's medical history. In 1998, Sims and Rothman moved for summary adjudication as to these claims. In July 1999, the trial court granted the motions, finding that there was no evidence to support petitioners' fraud claims. At about the same time, the court held, in connection with a motion for summary adjudication brought by Cryobank, that Brittany is not entitled to recover general damages or damages for lost earnings.

*Donor Profile.*

In 1986, Donor No. 276 completed a document entitled "About The Donor" (hereafter Donor Profile). In January 1996, prior to filing suit, Diane contacted Cryobank and requested a copy of the Donor Profile. Although a copy of the document was provided, the Johnsons did not know, and real parties did not disclose to them, that page 9 had been rewritten, and that certain notations contained on the original page 9 had been deleted.

During the course of the action, petitioners propounded discovery to Cryobank in an effort to obtain a copy of Donor No. 276's files and records maintained by Cryobank. Cryobank objected to providing any information regarding Donor No. 276, claiming the donor's right to privacy and his physician-patient privilege. (*Johnson, supra,* 80 Cal.App.4th at p. 1057.)

In 1998, petitioners served Donor No. 276 with a subpoena to attend his deposition and produce his medical records and certain documents showing his involvement with Cryobank. (*Johnson, supra,* 80 Cal.App.4th at pp. 1059-1060.) When he failed to appear, petitioners moved to compel his attendance and production of the requested records. (*Id.* at p. 1060.) When the trial court denied the motion, petitioners filed a petition for writ of mandate, which we granted. (*Id.* at pp. 1060, 1073.)

In May 2000, this court ruled that petitioners could take Donor No. 276's deposition, and "delve into his and his family's health and medical history, and his communications with Cryobank." (*Johnson, supra,* 80 Cal.App.4th at p. 1073.)

On April 25, 2001, the trial court issued an order directing the donor's deposition. At the first session of the deposition, held on May 29, 2001,

Cryobank produced a redacted copy of its file on Donor No. 276. Petitioners' counsel briefly reviewed the contents of the file, and in so doing, learned for the first time that the copy of the Donor Profile Diane received from Cryobank on January 30, 1996, differed from the copy found in Donor No. 276's file. Specifically, on the original page 9, Donor No. 276's affirmative answers to the questions concerning the presence of kidney disease in his mother and his aunt/uncle were circled, a question mark was written next to each "X," and the notation "at risk for kidney disease" was written directly above the "X" denoting his mother's kidney disease. The document contained three different colors of ink. On October 2, 2001, after a number of requests to Cryobank's counsel, petitioners were provided with a color-copy of the original Donor Profile. The color-copy of page 9 revealed that the donor's responses were written in blue ink, the question marks next to the donor's X's for his family's kidney disease were written in black ink, the notation "at risk for kidney disease" was written in black ink, and the circles around the X's were written in red ink.

*Petitioners' Motions.*

In October 2001, petitioners filed two motions. The first sought an order allowing petitioners to amend the second amended complaint to add a claim for punitive damages. The second, based on sections 473 and 1008 and the trial court's inherent equitable power, sought reconsideration of the 1999 ruling that Brittany is not entitled to recover damages for loss of earnings and general damages, and of the 1999 orders summarily adjudicating the fraud causes of action in favor of Sims and Rothman.

*Trial Court Rulings.*

The trial court denied petitioners' motion to amend the second amended complaint to add a punitive damages claim without prejudice to the filing of a section 425.13, subdivision (a) motion. The trial court also denied petitioners' motion to vacate or reconsider the 1999 summary adjudication orders in favor of Sims and Rothman, and the 1999 ruling prohibiting Brittany's recovery of general damages and damages for loss of earnings. The court found that the motions were untimely under section 1008, subdivision (a), and that petitioners had failed to produce evidence establishing extrinsic fraud as required by section 473. This petition for writ of mandate followed.

III.   DISCUSSION

A.   *Petitioners were required to comply with section 425.13, subdivision (a) prior to amending their complaint to add a claim for punitive damages.*

Petitioners' motion for leave to amend the operative complaint to add a claim for punitive damages was denied without prejudice to the filing of a

motion pursuant to section 425.13, subdivision (a).[5] Petitioners contend this was error because Cryobank is not a health care provider as that term is used in section 425.13, subdivision (b), and Sims, Rothman and Cryobank were not acting as health care providers at the time they rendered the services described in the second amended complaint.

1. *Section 425.13.*

Section 425.13, enacted in 1987 as a part of the Brown-Lockyer Civil Liability Reform Act, imposes procedural requirements on a party claiming punitive damages in a medical malpractice action. (*Central Pathology Service Medical Clinic, Inc. v. Superior Court* (1992) 3 Cal.4th 181, 188 [10 Cal.Rptr.2d 208, 832 P.2d 924] (*Central Pathology*).) Subdivision (a) of the statute provides that "[i]n any action for damages arising out of the professional negligence of a health care provider, no claim for punitive damages shall be included in a complaint or other pleading unless the court enters an order allowing an amended pleading that includes a claim for punitive damages to be filed. The court may allow the filing of an amended pleading claiming punitive damages on a motion by the party seeking the amended pleading and on the basis of the supporting and opposing affidavits presented that the plaintiff has established that there is a substantial probability that the plaintiff will prevail on the claim pursuant to Section 3294 of the Civil Code. The court shall not grant a motion allowing the filing of an amended pleading that includes a claim for punitive damages if the motion for such an order is not filed within two years after the complaint or initial pleading is filed or not less than nine months before the date the matter is first set for trial, whichever is earlier."

Subdivision (b), added in 1988, provides that "[f]or the purposes of this section, 'health care provider' means *any person* licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, or licensed pursuant to the Osteopathic Initiative Act, or the Chiropractic Initiative Act, or licensed pursuant to Chapter 2.5 (commencing with section 1440) of Division 2 of the Health and Safety Code; *and any clinic, health dispensary, or health facility,* licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code. 'Health care provider' includes the legal representatives of a health care provider." (Italics added.)

Although section 425.13 is not part of the Medical Injury Compensation Reform Act (MICRA) (*Perry v. Shaw* (2001) 88 Cal.App.4th 658, 666, fn. 3

---

[5]Although the trial court stated that it was "not making a determination that [real parties] are healthcare providers under" section 425.13, implied in the ruling is that Cryobank is a health care provider, and that Cryobank, Sims and Rothman were acting as health care providers at the time they rendered the professional services at issue in this case.

[106 Cal.Rptr.2d 70]), the language of section 425.13, subdivision (b) is virtually identical to the language of Civil Code section 3333.2, subdivision (c)(1),[6] a MICRA provision enacted in 1975. ■ Where, as here, the same phrase appears in different statutory schemes, we can assume the Legislature intended the phrases to be accorded the same meaning only if the statutes involved have the same or similar designs and objectives. We therefore look to the legislative history underlying each of the statutes. (*Delaney v. Baker* (1999) 20 Cal.4th 23, 32-40 [82 Cal.Rptr.2d 610, 971 P.2d 986].)

■ Civil Code section 3333.2, which limits the size of any award of noneconomic damages in an action for injury against a health care provider based on professional negligence, is an integral part of MICRA. (*Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 104 [32 Cal.Rptr.2d 263, 876 P.2d 1062].) MICRA, which includes "a variety of provisions all of which are calculated to reduce the cost of insurance by limiting the amount and timing of recovery in cases of professional negligence," was enacted "in response to a medical malpractice insurance 'crisis,' which [the Legislature] perceived threatened the quality of the state's health care. [Citation.]" (*Id.* at p. 111.) The Legislature's goal " 'was to bring down premiums so that doctors could continue to practice medicine in California, and charge reasonable prices.' " (*Perry v. Shaw, supra,* 88 Cal.App.4th at p. 668.)

■ We recognize that medical malpractice insurance does not cover punitive damages (*Peterson v. Superior Court* (1982) 31 Cal.3d 147, 157, fn. 4 [181 Cal.Rptr. 784, 642 P.2d 1305]), and that the Legislature's goal in enacting section 425.13 was not to reduce the cost of malpractice insurance. Rather, it was to require "greater certainty of the propriety of imposing punitive damages by requiring clear and convincing evidence of fraud, malice, or oppression," and to provide health care providers with "additional protection by establishing a pretrial hearing mechanism by which the court would determine whether an action for punitive damages could proceed." (*Central Pathology, supra,* 3 Cal.4th at p. 189.) Although it is clear that Code of Civil Procedure section 425.13 was not enacted for the same reasons as MICRA, both statutes were adopted to protect health care providers. MICRA

---

[6]Civil Code section 3333.2, subdivision (c)(1) provides that "[f]or the purposes of this section: [¶] . . . '[h]ealth care provider' means any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, or licensed pursuant to the Osteopathic Initiative Act, or the Chiropractic Initiative Act, or licensed pursuant to Chapter 2.5 (commencing with Section 1440) of Division 2 of the Health and Safety Code; and any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code. 'Health care provider' includes the legal representatives of a health care provider."

"reflects a strong public policy to contain the costs of malpractice insurance by controlling or redistributing liability for damages, thereby maximizing the availability of medical services to meet the state's health care needs" (*Western Steamship Lines, Inc. v. San Pedro Peninsula Hospital, supra,* 8 Cal.4th at p. 112), while Code of Civil Procedure section 425.13 "shelter[s] health care providers from the need to defend against punitive damage claims which have no substance." (*Looney v. Superior Court* (1993) 16 Cal.App.4th 521, 532 [20 Cal.Rptr.2d 182].) The Legislature's decision to provide health care practitioners with a procedural hurdle designed to weed out meritless punitive damage claims suggests the Legislature believed that such a mechanism was necessary to ensure that health care providers would not be embroiled in frivolous litigation that would affect their ability to continue to provide medical services to meet the health care needs of Californians. ■ We are satisfied that the legislative purposes underlying Code of Civil Procedure section 425.13 and Civil Code section 3333.2 are similar enough to support a finding that the Legislature intended that the phrase "health care provider" found in Code of Civil Procedure section 425.13, subdivision (a) be accorded the same meaning as the identical phrase found in Civil Code section 3333.2, subdivision (c)(1).

2. *Cryobank is a health care provider as that term is used in section 425.13, subdivision (b).*

■ Cryobank claims that because it is licensed as a clinical laboratory under Business and Professions Code, division 2, section 1200 et seq.,[7] and as a tissue bank pursuant to division 2, chapter 4.1, commencing with Health and Safety Code section 1635,[8] it qualifies as a "health care provider" as that term is defined in section 425.13, subdivision (b). However, in *Kotler v. Alma Lodge* (1998) 63 Cal.App.4th 1381 [74 Cal.Rptr.2d 721], a case interpreting Civil Code section 3333.2, the court rejected appellants' contention that *any entity* licensed under Health and Safety Code division 2 falls within the ambit of MICRA, noting that "[t]he express language of [Civil Code section 3333.2, subdivision (c)(1)] . . . states otherwise: A health care provider under MICRA is 'any clinic, health dispensary, or health facility, licensed pursuant to Division 2 [of the Health and Safety Code] . . . .' (Civ. Code, § 3333.2, subd. (c)(1).) Thus, the only Division 2 licensees entitled to

---

[7] A clinical laboratory, licensed pursuant to division 2 of the Business and Professions Code, is defined in section 1206, subdivision (a)(7) as "any place used, or any establishment or institution organized or operated, for the performance of clinical laboratory tests or examinations or the practical application of the clinical laboratory sciences." Business and Professions Code section 1206, subdivision (a)(5) defines "[c]linical laboratory science" as "any of the sciences or scientific disciplines used to perform a clinical laboratory test or examination."

[8] Cryobank was licensed as a tissue bank in 1990.

the protections of MICRA are those licensed as clinics, health dispensaries or health facilities. [Citation.]" (*Kotler, supra,* 63 Cal.App.4th at p. 1391.) The *Kotler* court concluded that "[n]ot only would a contrary holding render surplusage the Legislature's use of the terms 'clinic,' 'health dispensary' and 'health facility' to specify which Division 2 licensees are covered by MICRA, this limitation also makes sense in light of MICRA's purpose, which was to remedy a health care crisis attributed to the high cost of malpractice insurance. [Citation.]" (*Ibid.*) The limitation identified by the *Kotler* court also makes sense in light of the legislative purpose behind section 425.13, which was to protect health care practitioners from the need to defend against meritless punitive damage claims. (*Looney v. Superior Court, supra,* 16 Cal.App.4th at p. 532.)

Cryobank apparently concedes that it is not a "clinic" as defined by Health and Safety Code section 1200,[9] or a health facility under Health and Safety Code section 1250.[10] Cryobank claims, however, that it qualifies as a "health dispensary," and thus is a "health care provider" under section 425.13, subdivision (b).

*Coe v. Superior Court* (1990) 220 Cal.App.3d 48 [269 Cal.Rptr. 368] (*Coe*) lends support for Cryobank's claim. In *Coe,* the issue was whether a blood bank was a "health care provider" under Civil Code section 3333.2. (*Coe, supra,* 220 Cal.App.3d at p. 49.) Irwin Memorial Blood Bank held two licenses, one under division 2 of the Business and Professions Code as a clinical laboratory, and one under division 2 of the Health and Safety Code as a blood bank. (*Coe, supra,* at pp. 50-51.) Turning to the definition of "blood bank" which is defined in Health and Safety Code section 1600.2 as " 'any place where human whole blood, and human whole blood derivatives specified by regulation, are collected, prepared, tested, processed, or stored, or from which human whole blood or human whole blood derivatives specified by regulation are distributed' " (*Coe, supra,* at p. 53, fn. 4), the *Coe* court found that the term "health dispensary" includes blood banks, since a blood bank "dispenses a product and provides a service inextricably identified with the health of humans." (*Id.* at p. 53.) The *Coe* court reasoned that because blood is so vital to human health, the legislative purpose in enacting MICRA, to assure health care was available to the "medically indigent" and

---

[9]A "clinic" under Health and Safety Code section 1200 is "an organized outpatient health facility which provides direct medical, surgical, dental, optometric, or podiatric advice, services, or treatment to patients who remain less than 24 hours, and which may also provide diagnostic or therapeutic services to patients in the home as an incident to care provided at the clinic facility."

[10]A "health facility" under Health and Safety Code section 1250 is "any facility, place, or building that is organized, maintained, and operated for the diagnosis, care, prevention, and treatment of human illness, physical or mental, including convalescence and rehabilitation . . . to which the persons are admitted for a 24-hour stay or longer . . . ."

"the economically marginal," would be served by including a blood bank within the ambit of the MICRA protections. (*Id.* at p. 53, fn. 5.)

The similarities between *Coe* and the instant case are marked. Cryobank, like the blood bank in *Coe*, is licensed as a clinical laboratory under division 2 of the Business and Professions Code, and holds a license under division 2 of Health and Safety Code. Sperm banks are regulated under Health and Safety Code chapter 4.1, "Tissue Banks" (Health & Saf. Code, § 1635 et seq.),[11] while blood banks are regulated under Health and Safety Code, chapter 4, "Human Whole Blood, Human Whole Blood Derivatives, and Other Biologics" (Health & Saf. Code, § 1600 et seq.). Sperm banks, like blood banks, are subject to regulations that mandate screening for certain conditions and infectious disease. (See Health & Saf. Code, §§ 1603.3, 1626, subd. (c), 1639 et seq., 1644.5.) The main difference between blood banks and sperm banks seems to be that Health and Safety Code section 1607, which regulates the licensing requirements for personnel who may collect human blood, specifically provides at subsection (2) of section (a) that the collection of human blood must be "performed under the direct and responsible supervision of a licensed physician and surgeon." No similar requirement exists with respect to the collection of sperm by sperm banks. (See Health & Saf. Code, § 1639.1.) While this fact is significant, it is not dispositive of the issue of whether a sperm bank can be considered a "health dispensary." Under *Coe*, the factors to be considered are whether (1) Cryobank dispenses a product, and (2) the service is "inextricably identified with the health of humans." (*Coe, supra,* 220 Cal.App.3d at p. 53.)

There is no question that Cryobank dispenses a product (sperm), and provides a service (provision of donor sperm to health care practitioners and their clients). Petitioners contend, however, that the service offered is not "inextricably identified with the health of humans." We disagree. The first documented case of human artificial insemination in the United States occurred in 1866. (See Note, *FDA Approved?: A Critique of the Artificial Insemination Industry in the United States* (1997) 30 U.Mich.J.L. Reform 823, 826.) Since that time, artificial insemination has become an increasingly popular means of achieving parenthood.[12] (Note, *supra,* at p. 823.) A wide variety of factors leads individuals to their decision to use the

---

[11]"Tissue bank" is defined in Health and Safety Code section 1635, subdivision (d) as "any place, establishment, or institution that collects, processes, stores, or distributes tissue for transplantation into human beings." "Tissue" includes both sperm and blood. (Health & Saf. Code, § 1635, subd. (c).) " 'Transplantation' is the act or process of transferring tissue, including by ingestion, from a donor to the body of the donor or another human being." (Health & Saf. Code, § 1635, subd. (e).)

[12]By 1941, approximately 10,000 births had resulted from this technique. Between 1941 and 1963, approximately 1,000 to 1,200 children were conceived annually through artificial

procedure, including genetic disorders, sexually transmitted disease, and male partner infertility. (*Id.* at p. 827.) In response to the increase in documented cases of artificial insemination, organizations such as the American Fertility Society and the American Association of Tissue Banks (AATB) began publishing professional guidelines for biological and genetic screening of donor semen, emphasizing that properly screened sperm is essential to the health of a child conceived by artificial insemination. (*Id.* at pp. 824, 835.) Regulation of the industry followed. (*Id.* at p. 836.)

Prior to 1991, tissue transplants (such as skin grafts and artificial insemination) were essentially unregulated. (Legis. Analyst, Rep. to Assem. Com. on Health, Assem. Bill No. 2209 (1991-1992 Reg. Sess.) Aug. 16, 1991.) In March 1991, Assembly Bill No. 2209 was introduced to require tissue banks to have a license issued by the Department of Health Services (Department). (Assem. Bill No. 2209 (1991-1992 Reg. Sess.).) The Department urged adoption of the bill because it believed "that standards are required and surveillance is needed to ensure that tissue is properly stored, labeled, tested, and transported to meet new medical demands for human tissue." (*Ibid.*) "The provisions, structure, and authority within [the] bill [were] modeled after current statutory control of blood and blood products." (Staff Analyst, analysis of Assem. Bill No. 2209 (1991-1992 Reg. Sess.) p. 2.) Argued in support of the bill was that "[l]iving tissues are commonly employed to save or restore patients today, yet no body of law protects recipients from potential infection, mistyping, or related injury. This bill is necessary to maintain the high industry standards essential to effective transplantation." (*Ibid.*) What is clear from the history of the bill is that the Legislature recognized that the use of semen, among other tissues, has the power to affect human health. We therefore conclude that the service provided by Cryobank—the provision of semen to health care practitioners and their clients—is "inextricably identified with the health of humans."

Petitioners contend that the legislative purpose underlying section 425.13 will not be furthered by declaring Cryobank to be a health care provider since sperm is not "vital" to human health and the provision of sperm is not necessary to protect the "medically indigent" and "the economically marginal." (*Coe, supra,* 220 Cal.App.3d at p. 53, fn. 5.) Nothing contained in *Coe* requires us to consider whether the legislative purpose underlying section 425.13 will be furthered by declaring Cryobank to be a health care

insemination. In 1970, the first commercial sperm bank opened its doors. By 1987, at least 11,000 physicians were performing artificial insemination, using donors from more than 400 sperm banks. By 1993, more than 80,000 women were undergoing artificial insemination each year, resulting in the conception of more than 30,000 babies. (See Note, *FDA Approved?: A Critique of the Artificial Insemination Industry in the United States, supra,* 30 U.Mich.J.L. Reform at p. 826.)

provider. We note, however, that while the ability to purchase and sell donor sperm may not be *essential* to human health in the same sense as blood and there is no *necessity* that donor sperm be made available to the "medically indigent" or the "economically marginal," sperm is vital in numerous instances each year to procreation. And healthy sperm, together with a safe artificial insemination process, is vital to the birth of a healthy child. We therefore conclude that Cryobank qualifies as a "health dispensary," and thus a "health care provider" as that term is used in section 425.13, subdivision (b).

*Sims, Rothman and Cryobank.* Petitioners concede that Sims and Rothman are licensed physicians and thus are health care providers. Petitioners claim, however, that because Sims and Rothman (on behalf of Cryobank) were not acting as health care providers at the time they rendered the services described in the second amended complaint, petitioners had no obligation to comply with section 425.13, subdivision (a).[13]

■ The protections set forth in section 425.13 apply "whenever an injured party seeks punitive damages for an injury that is *directly related* to the professional services provided by a health care provider acting in its capacity as such . . . ." (*Central Pathology, supra,* 3 Cal.4th at p. 191, italics added.) Thus, although section 425.13 on its face applies only to actions involving "negligence," its procedures must be followed even if the plaintiff alleges an intentional wrong such as fraud. (*Central Pathology, supra,* at p. 192.)

■ To determine whether the injury that is the basis for the claim was caused by conduct that was directly related to the rendition of professional services, we examine the allegations contained within the complaint. (*Central Pathology, supra,* 3 Cal.4th at p. 192.)

Petitioners allege that Cryobank is a tissue bank licensed under California law; Sims and Rothman are licensed physicians in the State of California;

---

[13]Petitioners stated within the original complaint that they reserved the right to add a claim for punitive damages upon obtaining a court order allowing such a claim. However, in their first amended complaint petitioners alleged that real parties stood in the position of medical providers to petitioners. This same allegation was repeated in the second amended complaint. Real parties cite the familiar rule that where, as here, a party files an amended complaint in an attempt to avoid the defects of the original complaint by omitting facts which made the previous complaint defective the court may take judicial notice of the prior pleadings and may disregard any inconsistent allegations. (See, e.g., *Colapinto v. County of Riverside* (1991) 230 Cal.App.3d 147, 151 [281 Cal.Rptr. 191].) The rule is inapplicable here, however, since it is a question of law as to whether a particular business entity is a health care provider, and whether that entity and physicians employed by it are acting in the capacity of health care providers when they render certain services.

Cryobank made representations and assurances to petitioners regarding the safety of the human sperm which was purchased at Cryobank; and that Cryobank represented that it tested and screened its donors to "assure they were healthy and reasonably free of disease." Petitioners also allege that Sims and Rothman interviewed Donor No. 276 in order to obtain detailed information regarding his medical history and the medical history of his family. Specifically, petitioners allege that Sims and Rothman obtained information regarding the donor's mother and aunt, that they suffered kidney disease, high blood pressure and hearing loss, and that this "clearly signaled the presence of ADPKD to defendant Sims, Rothman and Cryobank." Petitioners further allege that the "donor clearly informed [real parties] of multiple incidents in his family history of relatives being afflicted with kidney disease coupled with hypertension which even in 1986 was symptomotology commonly known by the medical community in the United States as red flag indicators of a highly aggressive genetically transferred life threatening kidney disease, ADPKD."

Petitioners brush aside these allegations, claiming that no special knowledge, skill or care as a member of the medical profession was required of Sims or Rothman at the time they performed the genetic screening, only common sense and the ability to read the AATB standards.[14] Of course, the test is not the degree of skill required, but whether negligence occurred in rendering services for which a provider is licensed. (*Williams v. Superior Court* (1994) 30 Cal.App.4th 318 [36 Cal.Rptr.2d 112] (*Williams*).)

Although genetic screening, under the AATB guidelines cited by petitioners, may be performed by someone other than a physician, this does not mean that Sims and Rothman were not acting as health care providers when they reviewed the information taken from the Donor Profile. The record reveals that the evaluation process at Cryobank consisted of laboratory tests,[15] a physical examination, and an in-person interview. Each of these phases required the application of medical knowledge and experience to the information that was received. According to the AATB standards, an interviewer is required to make an evaluation as to whether a particular condition proposes a risk of one percent or less to the offspring. The interviewer is then required to evaluate whether there is a medical problem that has a possible genetic etiology. To do so, the interviewer applies all the information gathered to medical knowledge of genetics and disease states, to determine whether a potential donor poses a risk to offspring. Petitioners allege that Sims and Rothman, on behalf of Cryobank, participated in the screening

---

[14]Sims testified in deposition that Cryobank adhered to the AATB standards.

[15]The record shows that blood tests and other laboratory tests are performed on potential donors, including testing for infectious disease.

of Donor No. 276, and that both physicians evaluated the donor's information in order to determine whether the donor posed a risk to offspring.

We conclude that Sims and Rothman and thus Cryobank were providing professional services when Donor No. 276 was interviewed and approved for the donor program. (See, e.g., *Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 271 [7 Cal.Rptr.2d 101] (*Osborn*) [holding that a blood bank is a medical provider under MICRA, and that donor screening and blood testing are "professional services" for purposes of MICRA].)

Petitioners, characterizing the purchase and sale of donor sperm as a "purely *commercial* transaction," suggest that because there existed no physician-patient relationship between real parties and Donor No. 276 or between real parties and petitioners[16] they had no obligation to comply with section 425.13, subdivision (a). However, the absence of a physician-patient relationship does not excuse petitioners from complying with the statute. (See *Williams, supra,* 30 Cal.App.4th at pp. 323-324.)

In *Williams,* a phlebotomist, a nonemployee of the defendant rehabilitation institution, acquired HIV while drawing blood from a violent patient. The patient thrashed around, causing the needle, already contaminated with his blood, to puncture her gloved hand and lacerate her thumb. She sued, contending that section 425.13 did not apply "because she [had] alleged no facts bringing her claim under professional negligence statutes and because no health care provider services were rendered to her by" the rehabilitation institute. (*Williams, supra,* 30 Cal.App.4th at p. 323.) On appeal, the court held that the plaintiff's action was within the scope of section 425.13, notwithstanding that the plaintiff was not a patient. "By adoption of section 425.13, the Legislature intended to protect health care providers from unsubstantiated claims for punitive damages in actions against those providers in their capacity as practitioners. [Citation.] While lawsuits unrelated to the practitioner's conduct in providing health care were not intended to be included [citation], it would defeat the purpose of the legislation if claims arising out of the practitioner's professional negligence were excluded from coverage simply because the injured party was not a patient. We therefore conclude section 425.13 applies to *any foreseeable injured party, including patients, business invitees, staff members or visitors, provided the injuries alleged arose out of professional negligence.*" (*Williams, supra,* at p. 324, italics added.)

---

[16]In *Johnson,* we determined that no physician-patient relationship existed between Donor No. 276 and Sims and Rothman. (*Johnson, supra,* 80 Cal.App.4th at p. 1063.) The record shows that petitioners never consulted with Sims and Rothman regarding any health issue, and neither Sims nor Rothman provided medical care or treatment to petitioners. We therefore conclude that no physician-patient relationship existed between Sims and Rothman and petitioners.

In reaching its decision, the *Williams* court relied on *Atkins v. Strayhorn* (1990) 223 Cal.App.3d 1380 [273 Cal.Rptr. 231] (Civ. Code, § 3333.2 applied separately to a claim for loss of consortium brought by the spouse of an injured patient), *Yates v. Pollock* (1987) 194 Cal.App.3d 195 [239 Cal.Rptr. 383] (the limitation on noneconomic damages contained in Civ. Code, § 3333.2 applies in a wrongful death action initiated by deceased patient's survivors), and *Hedlund v. Superior Court* (1983) 34 Cal.3d 695 [194 Cal.Rptr. 805, 669 P.2d 41, 41 A.L.R.4th 1063] (§ 340.5, the MICRA statute of limitations governing actions for breach of professional negligence, applied where a woman sued two psychologists claiming injuries sustained as a result of psychologists' failure to disclose a patient's intentions of harming the plaintiff). (*Williams, supra,* 30 Cal.App.4th at pp. 323-324.) We recognize that these cases involve claims made by third parties arising out of a doctor-patient relationship. However, what these cases make clear is that in deciding whether a plaintiff is required to comply with section 425.13, the focus is not on whether the defendant health care provider and the injured party had a doctor-patient relationship, but on whether the health care provider charged with negligence was acting in the capacity of a health care provider at the time of the allegedly tortious acts. The collection, processing, and testing of sperm for use in artificial insemination requires the exercise of professional expertise and professional judgment. Under *Williams* and the authorities cited therein, the fact that there existed no physician-patient relationship between Cryobank and the donor or between Cryobank and petitioners is irrelevant.

Petitioners claim that Cryobank, Sims and Rothman improperly screened Donor No. 276's sperm, and that as a result, ADPKD was genetically transmitted to Brittany. Genetic screening, we conclude, is an ordinary and usual part of the medical professional services provided by real parties. Because the allegations contained with the operative complaint demonstrate that the injury that is the basis for petitioners' claim was caused by conduct that was directly related to the rendition of professional services, we conclude that petitioners were required to comply with section 425.13, subdivision (a) prior to asserting a claim for punitive damages against Cryobank, Sims and Rothman.

B. *Brittany cannot recover general damages or damages for loss of earnings.*

█ Petitioners contend the 1999 ruling barring Brittany from recovering general damages and damages for loss of earning was incorrect, and that the trial court abused its discretion in refusing to set the earlier ruling aside.

In 1999, the trial court, relying on *Turpin v. Sortini* (1982) 31 Cal.3d 220 [182 Cal.Rptr. 337, 643 P.2d 954] (*Turpin*) and *Andalon v. Superior Court*

(1984) 162 Cal.App.3d 600 [208 Cal.Rptr. 899] (*Andalon*), characterized Brittany's lawsuit as one for "wrongful life," and held that she is not entitled to recover general damages or damages for lost earnings. In 2001, petitioners' motion to reconsider and/or vacate the 1999 ruling was denied, prompting this petition. Even though the petition may be untimely, the damage issues have been fully briefed and are important for the guidance of the trial court and the litigants. We will therefore reach the issue. (*Andalon, supra,* 162 Cal.App.3d at pp. 605-606.)

*General Damages.* In *Turpin*, our Supreme Court ruled that a child born with a hereditary affliction (deafness) is entitled to maintain a tort action against a medical care provider who—before the child's conception—negligently failed to advise the child's parents of the possibility of the hereditary condition, depriving them of the opportunity to choose not to conceive the child. The gist of the minor's claim was that she had "suffered harm or damage as a result of defendants' negligent performance of their professional task, and that, as a consequence, she [was] entitled to recover under generally applicable common law tort principles." (*Turpin, supra,* 31 Cal.3d at p. 229.) With respect to the child's claim for pain and suffering or other general damages, our Supreme Court held that "recovery should be denied because (1) it is simply impossible to determine in any rational or reasoned fashion whether the plaintiff has in fact suffered an injury in being born impaired rather than not being born, and (2) even if it were possible to overcome the first hurdle, it would be impossible to assess general damages in any fair, nonspeculative manner." (*Id.* at p. 235.) The court explained, that "[i]n requesting general damages in a wrongful life case, the plaintiff seeks monetary compensation for the pain and suffering he or she will endure because of his or her hereditary affliction. Under [Restatement Second of Torts] section 920's benefit doctrine, however, such damages must be offset by the benefits incidentally conferred by the defendant's conduct 'to the interest of the plaintiff that was harmed.' With respect to general damages, the harmed interest is the child's general physical, emotional and psychological well-being, and in considering the benefit to this interest which defendant's negligence has conferred, it must be recognized that as an incident of defendant's negligence the plaintiff has in fact obtained a physical existence with the capacity both to receive and give love and pleasure as well as to experience pain and suffering. Because of the incalculable nature of both elements of this harm-benefit equation, we believe that a reasoned, nonarbitrary award of general damage is simply not obtainable." (*Id.* at pp. 236-237.)

*Damages for Lost Earnings.* In *Andalon*, a child afflicted with Down's syndrome, and his parents, brought an action against a physician alleging

that his medical malpractice, in providing prenatal care to the mother, resulted in the child's unwanted birth. (*Andalon, supra,* 162 Cal.App.3d at p. 604.) On appeal, the court held that "[t]he child's claim for loss of earning capacity is defeated by *Turpin*'s reasoning." (*Id.* at p. 614.) The court explained that "[t]here is no loss of earning capacity caused by the doctor in negligently permitting the child to be born with a genetic defect that precludes earning a living. One cannot lose what one never had. The plaintiff-child never had a wage-earning capacity that was taken away by the conduct of the doctor and cannot, therefore, claim compensation for its loss." (*Ibid.*) Like the claim for general damages in the *Turpin* wrongful life case, the claim for lost earnings "founders on the consideration that 'if defendants had performed their jobs properly, [the child] would not have been born [without a genetic defect], but—according to the complaint—would not have been born at all.' [Citation.]" (*Andalon, supra,* 162 Cal.App.3d at p. 614, citing *Turpin, supra,* 31 Cal.3d at p. 231.)

Brittany claims that because she alleges that Cryobank, Sims and Rothman "*caused* the inherited abnormalities at issue through their improper approval of Donor No. 276 as a sperm donor, despite their clear knowledge that he was 'at risk for kidney disease,' " her case differs from *Turpin* and *Andalon.* She argues that her causation allegations make her claim more like the one asserted by the plaintiff in *Hegyes v. Unjian Enterprises, Inc.* (1991) 234 Cal.App.3d 1103 [286 Cal.Rptr. 85] (*Hegyes*). We disagree.

In *Hegyes*, a woman was involved in an automobile accident, and as a result of injuries sustained, was fitted with a lumbo-peritoneal shunt. Two years later she became pregnant. During the pregnancy, the fetus compressed the lumbo-peritoneal shunt, and in order to avoid further injury to the mother, the child was delivered 51 days premature by cesarean section. The child allegedly suffered from injuries relating to premature birth. (*Hegyes, supra,* 234 Cal.App.3d at p. 1108.) The child sued the driver who had collided with the mother some two years prior to the child's birth. (*Ibid.*) On appeal, the court held that the negligent motorist owed no legal duty of care to the subsequently conceived child. (*Id.* at p. 1111.) In reaching its conclusion, the *Hegyes* court, citing *Turpin*, observed that "[g]enerally speaking, a 'wrongful life' case is brought by a genetically impaired child against a physician or other health care provider for preconception negligence in rendering medical counseling or testing. [Citation.] In a 'wrongful life' case, the child does not assert that the negligence of the defendant *caused* the inherited or congenital abnormalities. The essence of the child's claim is that the medical professional's breach of the applicable standard of care resulted in that child being *born* to experience the pain and suffering attributable to his or her affliction." (*Hegyes, supra,* at p. 1112.)

Regardless of what petitioners allege with respect to causation, it cannot be said that Cryobank, Sims and Rothman *caused* Brittany's inherited abnormalities by improperly approving Donor No. 276 as a sperm donor. Brittany's kidney condition was *caused* by the gene contained within the sperm provided by Donor No. 276. And the Johnsons allege that had they "been aware of the existence of the facts misrepresented and/or not disclosed" by real parties, they "would not have . . . agreed to purchase and use sperm from Donor No. 276 in order to effectuate their pregnancy." Implied in these allegations is that had the Johnsons been informed of the genetic risk, they would have selected another donor, and Brittany would not have been born.

Although we recognize the harshness of the rules set forth in *Turpin* and *Andalon*, we are nonetheless bound by *Turpin* and by extension, *Andalon*. We conclude that the trial court fairly characterized Brittany's cause of action as one for wrongful life, and that under *Turpin* and *Andalon* Brittany is not entitled to recover general damages or damages for lost earnings.

C. *The trial court is not precluded from reconsidering the 1999 orders granting summary adjudication of the fraud counts under its inherent equitable power.*\*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## IV. Disposition

The petition for writ of mandate is denied. The parties shall bear their own costs.

Boren, P. J., and Doi Todd, J., concurred.

A petition for a rehearing was denied September 25, 2002, and petitioners' petition for review by the Supreme Court was denied December 11, 2002.

---

\*See footnote, *ante,* page 869.