Chris CONDOS, Chad Rex Condos, Brandon Keith Condos and Christine Condos, individually and acting on behalf of and as next friend for Chelsie Condos, Lacey Condos and Carly Condos, Plaintiffs,

v.

MUSCULOSKELETAL TRANSPLANT FOUNDATION, a non-profit organization, Osteotech, Inc. a New Jersey corporation, John Does I–X, inclusive; Jane Does I–X, and Doe Corporations, Partnerships, Joint Ventures and Governmental Agencies, I–XX, Defendants.

No. 2:00–CV–0190.

United States District Court,
D. Utah,
Central Division.

July 8, 2002.

Douglas B Cannon, Fabian & Clendenin, Salt Lake City, UT, George L. Arnold, Jr, Evanston, WY, for Chris J. Condos, Chad Rex Condos, Brandon Keith Condos, Christene Condos, individually and acting on behalf of and as next friend for Chelsie Condos, Lacey Condos and Carly Condos, plaintiffs.

Robert G Wright, Michael P Zaccheo, Brandon B. Hobbs, Richards Brandt Miller & Nelson, Salt Lake City, UT, for Musculoskeletal Transplant Foundation, defendant.

Jay E. Jensen, Ray R. Christensen, Christensen & Jensen, Salt Lake City, UT, Patrick J. Feeley, John J. Lee, Dorsey & Whitney LLP, New York, NY, for Osteotech, Inc., defendant.

### MEMORANDUM OPINION AND ORDER

BENSON, District Judge.

### I. INTRODUCTION

The above-named plaintiffs filed this action against defendants Musculoskeletal Transplant Foundation ("MTF") and Osteotech, Inc. ("Osteotech") to recover damages for injuries allegedly caused by bone tissue that was implanted into plaintiff Chris Condos. Plaintiffs seek recovery under theories of strict products liability, breach of implied warranty, and negligence. Because plaintiffs' warranty claims require essentially the same analysis as strict liability, those claims will be treated jointly as strict products liability claims.[1] Defendants filed motions for summary judgment on all claims. Specifically, defendants ask the Court to find that strict products liability is not applicable to the distribution of human tissue and that the defendants were not negligent as a matter of law. Having considered the parties' briefs, oral arguments, and the relevant law, the Court issues the following Opinion and Order.

### II. BACKGROUND

In March 1998, Chris Condos underwent two surgical procedures wherein donated human bone tissue was implanted to repair Mr. Condos' spine. Subsequently, Mr. Condos tested positive for the Hepatitis C virus ("HCV"). Mr. Condos was never tested for HCV prior to the March 1998 surgery. However, plaintiffs' expert witness, Dr. James Trotter, believes Mr. Condos acquired HCV from the bone tissue grafted to Condos' spine in the surgery.

The bone tissue used in Mr. Condos' surgery was procured from a deceased human donor at LDS Hospital by an organ recovery organization under contract with MTF. After the bone tissue was sent to MTF for screening and storage, MTF sent it to a testing laboratory to be tested for various diseases, including HCV. MTF instructed the laboratory to use the FDA

---

1. *See Straub v. Fisher & Paykel Health Care,* 990 P.2d 384, 389 n. 1 (Utah 1999) ("elements of strict liability and breach of warranty are 'essentially the same' "); *Salt Lake City Corp. v. Kasler Corp.,* 855 F.Supp. 1560, 1572 (D.Utah 1994) ("The term 'warranty' as used in tort law is synonymous with strict liability.").

required ELISA II test, which allegedly is only capable of detecting HCV in its more mature stages. Although not approved by the FDA at the time, another test for detecting the presence of HCV, referred to as a PCR test, was known by and available to MTF. The PCR test allegedly detects HCV in its early stages when the ELISA II test will not.

After the bone tissue was tested, MTF sent the bone to Osteotech to be "processed." The processing included cleaning and shaping the bone tissue to prepare it for human implantation. Although Osteotech owns two patents that describe various improved methods of cleaning and sterilizing bone tissue, those methods were not used by Osteotech to clean the bone tissue used in Mr. Condos' surgery. Osteotech is currently attempting to implement these patented methods, but has been unable to do so successfully. After processing, Osteotech returned the bone tissue to MTF to be stored until requested for a patient. The bone tissue was eventually requested by LDS Hospital for implantation into Mr. Condos.

It is not disputed that MTF refers to the bone tissue it distributes as a "bone product" in its organizational and marketing materials. MTF also makes representations in its advertisements that doctors "never have to worry" when using MTF bone products. It is also undisputed that MTF does not make a profit on the distribution of bone tissue and sets its prices according to the costs of procuring, screening, testing, processing, and storing the tissue. In addition, the service contract between Osteotech and MTF specifies that neither entity claims ownership in the bone tissue, and that Osteotech only

charges MTF for the cleaning and shaping services it provides.

## III. DISCUSSION

Summary judgment is proper where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In this case, there are no disputed material facts. For the purposes of this Opinion, the Court will assume that Mr. Condos' contraction of HCV was caused by the bone tissue distributed to the hospital by MTF, although this fact is not proven. Therefore, this case presents two legal issues to be resolved by the Court. First, whether the law of strict products liability should apply in cases where donated human tissue causes injury. Second, whether the facts of this case are legally sufficient to allow a jury to decide the issue of negligence on the part of each defendant.

### A. Strict Products Liability

■ In *Ernest W. Hahn, Inc. v. Armco Steel Co.*, 601 P.2d 152 (Utah 1979), the Utah Supreme Court adopted the strict products liability doctrine defined in section 402A of the Restatement (Second) of Torts. That doctrine "imposes liability on those persons who *sell* any *product* in a defective condition." Restatement (Second) of Torts § 402A (1965) (emphasis added). Therefore, for strict liability to apply in this case, the Court must find that human bone tissue is a "product," and that there was a "sale" of that product.

■ Plaintiffs argue that human bone tissue is a "product" subject to strict liability because it fits the traditional product definitions found in strict liability cases.[2]

---

2. *See Trinity Universal Ins. Co. v. Streza*, 8 P.3d 613, 617 (Colo.Ct.App.2000) ("a product is something distributed commercially"); Utah Code Ann. § 10A–2–105 (2001) (defining

Specifically, the human bone tissue used in Mr. Condos' surgery is a tangible item, commercially distributed, the product of a manufacturing process, and the subject of a sales contract. Plaintiffs also point to the fact that MTF refers to the bone tissue as a "product" in its marketing and organizational documents. Regardless of how the price is calculated, plaintiffs claim the transfer of bone tissue for monetary consideration constitutes the "sale" of a "product." In other words, plaintiffs apply the old adage, "if it looks like a duck, walks like a duck, and sounds like a duck, it must be a duck." Such a conclusion is oversimplistic in this area of the law. Whether strict products liability should be extended to the distribution of human tissue for medical procedures is a policy-driven inquiry that cannot be answered by simple definitional applications.

In an attempt to find Utah legislative policy in their favor, plaintiffs cite the Utah Blood Shield Statute ("UBSS"). *See* Utah Code Ann. § 26–31–1 (1998). The UBSS expressly states that the distribution of "blood products" does not constitute a "sale" of a product. *Id.* Plaintiffs argue the UBSS is an implied recognition by the Utah legislature that blood is a "product" amenable to strict liability law. Likewise, plaintiffs argue bone tissue must also be recognized as a "product." Plaintiffs then claim the UBSS constitutes an "express repeal" of the application of strict products liability to human blood products. However, because other human tissue, such as bone tissue, was omitted from the "immunity" granted by the UBSS, plaintiffs allege bone tissue *remains* subject to strict liability. Plaintiffs' argument is self serving and illogical. Plaintiffs want the UBSS to imply that bone tissue, although

not mentioned in the statute, is a "product;" but plaintiffs do not want bone tissue to be exempt from products liability law *because* it is not mentioned in the statute.

Plaintiffs' argument under the UBSS is not persuasive. No court has ever applied strict liability to the distribution of human tissue. To characterize the UBSS as an "express repeal" of the application of strict liability to blood products is misleading. The UBSS merely shows the legislative intent to keep human blood distribution out of products liability law. It cannot reasonably be read as an implied acknowledgment that other human tissue is a "product" subject to strict liability.

Plaintiffs' only plausible arguments are pure public policy arguments. Plaintiffs argue that the policies underlying strict liability logically apply to human tissue distribution. Strict liability was created because of the limitations in negligence remedies and to protect consumers in an increasingly complex society. *See Ernest*, 601 P.2d at 157. Patients are helpless to prevent harm caused by infected human tissue distributed to hospitals for implantation or transfusion. Because the risks of harm are great, plaintiffs believe entities such as MTF and Osteotech should be held to a higher standard to prevent injury. While these policy arguments have some merit, this Court is not in a position to decide state tort law policy, especially in light of the clear legislative policy indications to the contrary.

As stated previously, Utah has adopted the strict products liability laws and policies found in the Restatement (Second) of Torts. The Restatement (Third) updates the area of products liability law in light of the extensive use of human tissue and

"goods" as "tangible things ... which are moveable and are the subject of a contract for

sale").

states, "human blood and human tissue even when provided commercially, are not subject to the rules of this Restatement." Restatement (Third) of Torts, § 19 (1998). This is consistent with a general policy throughout the nation, as observed by the American Law Institute, against applying strict liability to the distribution of human tissue. *See* Restatement (Third) of Torts, § 19(a)-(c), and Reporter's Notes: *Comment c. Tangible Personal Property: Human Blood and Human Tissue.*

Of more significance is the policy indicated by the Utah legislature through the Uniform Anatomical Gift Act ("UAGA"), which prohibits the sale of human tissue for valuable consideration. *See* Utah Code Ann. § 26-28-10 (1995). The UAGA expressly allows the reasonable payment for services such as recovery, processing, storage and distribution related to such human tissue. Clearly, the Utah legislature does not consider the manner in which MTF distributes human bone tissue to hospitals to be a "sale." MTF and Osteotech are careful to only charge for the services they provide and properly disclaim any ownership of the bone tissue in their operating contracts.

Finally, contrary to plaintiffs' position, the UBSS is further evidence of a legislative policy to keep human tissue distribution for medical purposes out of products liability law. The UBSS emphasizes that the "distribution, or use of whole human blood, plasma, blood products, and blood derivatives for the purpose of injecting or transfusing them into the human body ... shall be construed to be ... a service [rather than] a sale." Utah Code Ann. § 26-31-1 (1998). This statement recognizes that medical transfusions and transplants are essentially medical services, even though a tangible item is involved in the process. Accordingly, the Court finds that human bone tissue is not a "product"

subject to products liability law, and that the distribution of human tissue, including reasonable payments for related services, does not constitute a "sale" for purposes of strict liability. Defendants' summary judgment motions are granted with respect to plaintiffs' strict liability claims.

## B. Negligence of MTF

█ Plaintiffs argue MTF breached its duty of ordinary care by not instructing the testing laboratory to use the PCR test to detect HCV in the bone tissue used in Mr. Condos' surgery. Plaintiffs' expert, Dr. Aleem Siddiqui, states the PCR test would likely have detected the HCV in the bone tissue and ultimately prevented Mr. Condos' injury. In response, MTF correctly argues that Dr. Siddiqui has not shown that the PCR test was the industry standard, and thus has not shown a breach of that standard. Indeed, plaintiffs do not claim MTF violated industry standards at all. Plaintiffs' position is that the industry standard itself falls short of the required duty of ordinary care in light of the great risk for harm and the low costs of implementing the superior PCR test.

The Court recognizes there are those cases where an entire industry could be performing under a deficient standard. Indeed, it is a "well known tort doctrine that proof of compliance with the applicable 'industry' standard will not insulate a defendant from liability when the standard itself is inadequate." *Lambert v. Park*, 597 F.2d 236, 238–39 (10th Cir.1979). However, this is not one of those cases. Plaintiffs have not offered any evidence that the tissue banking industry as a whole is negligent. In fact, plaintiffs' experts do not purport to be experts of the industry at all. Plaintiffs only offer evidence that MTF requested the FDA required test rather than the PCR test. The Court has not been made aware of any tissue bank

that regularly used the PCR test at the time in question. In fact, the PCR test had not yet been approved by the FDA, even though it was widely available. Under these circumstances, no reasonable jury could conclude that MTF acted negligently in screening, storing and distributing the bone tissue used in Mr. Condos' surgery. Accordingly, MTF's motion for summary judgment on plaintiffs' negligence claims is granted.

### C. Negligence of Osteotech

■ Plaintiffs claim Osteotech was negligent for failing to use the cleaning methods described in its patents. Plaintiffs' expert believes the methods described in the patents would likely have sterilized the bone tissue in such a way that Mr. Condos would not have contracted HCV. However, that opinion alone is grossly inadequate to establish negligence. Plaintiffs offer no evidence to indicate the patented procedures were actually available to Osteotech at the time the bone was processed. The fact the methods were patented does not prove the methods were available in practice. Osteotech admits it has attempted, and is still attempting, to implement its patented technology, but has not yet succeeded. This fact is undisputed. As a matter of law, a party cannot be found negligent for failing to use an undeveloped, unavailable process. Therefore, Osteotech's motion for summary judgment on plaintiffs' negligence claims is granted.

### IV. CONCLUSION

For the reasons stated above, the Court hereby GRANTS defendants' motions for summary judgment on all of plaintiffs' claims. IT IS SO ORDERED.