[No. H024960. Sixth Dist. July 25, 2003.]

CRYOLIFE, INC., Petitioner, v.
THE SUPERIOR COURT OF SANTA CRUZ COUNTY, Respondent;
ALAN J. MINVIELLE, Real Party in Interest.

COUNSEL

Moore, Winter, Skebba & McLennan, Raymond B. Moore and Matthew R. Rungaitis for Petitioner.

No appearance for Respondent.

Law Offices of G. Dana Scruggs, G. Dana Scruggs III and Nathan C. Benjamin for Real Party in Interest.

OPINION   .

**PREMO, Acting P. J.—**

## I.  INTRODUCTION

In this original proceeding, defendant Cryolife, Inc. (Cryolife) petitions for extraordinary relief from the orders of respondent court overruling Cryolife's demurrer to the cause of action for strict products liability and denying Cryolife's motion to strike the punitive damages claim. Petitioner contends, as a matter of first impression, that real party in interest Alan J. Minvielle cannot state a cause of action for strict products liability because Cryolife is a

tissue bank that as a matter of law provided a service, not a product, when it supplied an allegedly infected cadaver tendon for real party in interest's knee surgery. Petitioner also argues as a matter of first impression that because it is a tissue bank, it is a health care provider within the meaning of Code of Civil Procedure section 425.13,[1] and therefore a claim for punitive damages cannot be asserted in the absence of an order granting leave to amend the complaint. We agree with both of petitioner's arguments, and therefore we will issue a peremptory writ of mandate directing respondent court to vacate its orders overruling the demurrer to the strict liability cause of action and denying the motion to strike the punitive damages claim.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A.  *The First Amended Complaint*

According to the allegations of the first amended complaint, this action arises from knee surgery performed on Alan J. Minvielle (Minvielle or plaintiff). The knee surgery involved a surgical graft procedure that utilized an allograft consisting of a patellar tendon obtained from a human cadaver. The allograft was supplied by defendant Cryolife, a tissue bank in the business of harvesting, preserving and distributing products derived from human tissue for medical use. Minvielle's knee pain increased after the surgery, and, two months later, the allograft was removed because it was infected with bacteria.

Cryolife allegedly represented in its marketing and promotional materials that its orthopedic tissue products were safe, sterile and uncontaminated. However, according to plaintiff, the truth was that Cryolife's tissue acquisition and processing methods were inadequate to protect patients from the risk of bacterial infection. Cryolife failed to warn the medical profession of the risk of using Cryolife's products and also failed to establish an adequate system for reporting adverse reactions to its products. Based on these allegations, plaintiff asserted causes of action against Cryolife for negligence, strict liability, fraud, and negligent misrepresentation. He also sought compensatory and punitive damages.

In the strict liability cause of action, plaintiff alleged in more detail that Cryolife's allograft products were not fit for their intended use of implantation in humans and that Cryolife had failed to warn either plaintiff or his health care providers of the risk of using Cryolife's potentially contaminated tissue. Also, plaintiff stated that Cryolife had "procured, harvested, evaluated,

---

[1] Hereafter all references to section 425.13 refer to Code of Civil Procedure section 425.13 unless otherwise indicated.

preserved, tested, promoted, sold, supplied, distributed and labeled the allograft products that were defective ... [¶] [and] knew that its products, and specifically the allograft implanted in Plaintiff's left knee, were to be purchased and used without inspection for defects by Plaintiff." Plaintiff further asserted that Cryolife intentionally and/or in conscious disregard of plaintiff's safety inadequately tested and treated its donor tissue products, misled plaintiff and health care providers regarding the safety of its products, and maliciously denied that an infection could be caused by its products.

## B. *Cryolife's Demurrers*

Cryolife demurred to the causes of action for strict products liability, fraud, and negligent misrepresentation, on the ground that the complaint failed to state sufficient facts for any cause of action. As to the strict products liability cause of action, Cryolife argued that the alleged facts were insufficient because strict products liability does not apply to services, and, as a tissue bank, Cryolife provides a service, not a product. Cryolife relied on Health and Safety Code[2] sections 1635 and 1635.2, which Cryolife asserted showed the Legislature's intent that the collection, processing, storage, and distribution of human tissue for the purpose of transplantation be deemed a service.[3]

Cryolife also relied on the decision in *Shepard v. Alexian Brothers Hosp.* (1973) 33 Cal.App.3d 606 [109 Cal.Rptr. 132], which held that strict products liability does not apply to blood banks because the Legislature expressly provided in section 1606 that the processing, distribution and use of blood products is construed to be a service for all purposes. Cryolife argued that the decision in *Shepard v. Alexian Brothers Hosp.* was dispositive of plaintiff's strict liability cause of action, because the public policy rationale favoring an adequate supply of blood over the application of the doctrine of strict liability in tort to the transfusion of blood and blood products applied with equal force to tissue used for tissue transplantation surgeries.

In his opposition to the demurrers, plaintiff responded that the complaint stated sufficient facts for a strict products liability cause of action because it was alleged that Cryolife manufactures tissue products and places them on

---

[2] All further statutory references are to the Health and Safety Code unless otherwise indicated.

[3] In pertinent part, section 1635, subdivision (d), provides, " 'Tissue bank' is any place, establishment, or institution that collects, processes, stores, or distributes tissue for transplantation into human beings." Section 1635.2 provides, "The Legislature hereby declares its intent that the collection, processing, storage, or distribution of tissue for the purpose of transplantation, as regulated by this chapter, shall be deemed a service by those persons engaged in these activities. Therefore, the collection, processing, storage, or distribution of tissue for the purpose of transplantation, as regulated by this chapter, shall not be subject to the requirements of Division 2 (commencing with Section 2101) of the Commercial Code."

the market knowing the products may cause serious injury. Plaintiff compared Cryolife's activities to a company that removes, repairs, reconditions, and sells used car parts. As additional support for his contention that Cryolife supplies a product, plaintiff noted that 21 Code of Federal Regulations part 1271.1 et seq., defines human tissue intended for transplantation into another human as a " 'tissue-based product.' "

Plaintiff also disputed Cryolife's contention that section 1635.2 provides tissue banks with statutory immunity from strict products liability. According to plaintiff, the language of section 1635.2 makes clear that the Legislature intended only to make the sales provisions of the Uniform Commercial Code inapplicable to tissue banks. Further, plaintiff argued that Cryolife's reliance upon an analogy between tissue banks and blood banks with respect to statutory immunity was misplaced, because the language of the blood bank statute, section 1606, differs significantly from the language of the tissue bank statute, section 1635.2. Finally, plaintiff argued that the public policy rationale for providing immunity from strict products liability for the lifesaving products of the nonprofit blood industry did not apply to tissue products manufactured for use in elective surgeries by the for-profit tissue bank industry.

## C. Cryolife's Motion to Strike

In its motion to strike, Cryolife sought to eliminate the punitive damages claim from the first amended complaint, on two grounds. First, Cryolife argued that the allegations regarding punitive damages were insufficient under Civil Code section 3294 because there were no allegations that the corporation's misconduct was on the part of an officer, director or managing agent. Second, Cryolife argued that the punitive damages allegations must be stricken because plaintiff had failed to comply with section 425.13, which requires a plaintiff to establish by motion that there is a substantial probability that he or she will prevail on a claim for punitive damages in order to obtain leave to amend the complaint to allege punitive damages against a health care provider. Cryolife again relied upon an analogy to blood banks in asserting that a tissue bank is a health care provider within the meaning of section 425.13, based on the decision in *Coe v. Superior Court* (1990) 220 Cal.App.3d 48 [269 Cal.Rptr. 368], that a blood bank is a health care provider as defined by MICRA (Medical Injury Compensation Reform Act; Stats. 1975, 2d Ex. Sess. 1975, ch.2, § 12.5, p. 4007).

In his opposition to the motion to strike, plaintiff contended that the allegations of the complaint were sufficiently specific for a viable punitive damages claim against a corporate defendant. Additionally, plaintiff argued that section 425.13 did not apply, because Cryolife is not a health care

provider which provided professional services to him. According to plaintiff, health care providers covered by MICRA include only clinics, health dispensaries, or health facilities licensed under Division 2 of the Health and Safety Code. Plaintiff asserted that Cryolife, as a manufacturer of medical products, was not a clinic, health dispensary, or health facility, and therefore Cryolife was not a health care provider within the meaning of MICRA or for purposes of section 425.13. Accordingly, plaintiff maintained that he could assert a claim for punitive damages without bringing a motion for leave to amend under section 425.13.

### D. *The Trial Court's Orders*

The trial court overruled Cryolife's demurrers to the causes of action for strict products liability, fraud, and negligent misrepresentation, and denied the motion to strike the punitive damages portion of the complaint. During the hearing, the trial court indicated that its order overruling the demurrer to the strict liability cause of action was based upon the court's agreement with plaintiff that section 1635.2 does not immunize Cryolife from strict products liability because, unlike section 1606, the blood bank immunity statute, section 1635.2 does not expressly state that tissue banks provide a service "for all purposes."

Cryolife petitioned for extraordinary relief from the trial court's orders and we issued an order to show cause in regard to the order overruling the demurrer to the strict liability cause of action and the order denying the motion to strike. We denied the petition in all other respects. We also issued a temporary stay of trial court proceedings while our writ review was pending.

### III. DISCUSSION

### A. *Availability of Writ Review*

An order overruling a demurrer is not directly appealable, but may be reviewed on appeal from the final judgment. (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 912–913 [55 Cal.Rptr.2d 724, 920 P.2d 669].) Appeal is presumed to be an adequate remedy, and writ review is rarely granted unless a significant issue of law is raised or resolution of the issue would result in a final disposition as to the petitioner. (*Curry v. Superior Court* (1993) 20 Cal.App.4th 180, 183 [24 Cal.Rptr.2d 495].) In the present case, writ review is appropriate because the petition raises two significant issues of first impression in the area of personal injury litigation: (1) whether a cause of action for strict products liability may be stated against a tissue bank that provided human tissue for surgical implantation; and (2) whether a tissue bank is a health care provider within

the meaning of section 425.13, and therefore a claim for punitive damages cannot be alleged in the absence of an order granting the plaintiff's motion for leave to amend the complaint to allege punitive damages against a health care provider.

Writ review is also appropriate for an order granting or denying a motion to strike the punitive damages allegations where the issue is the applicability of section 425.13. (See, e.g., *Palmer v. Superior Court* (2002) 103 Cal.App.4th 953, 961 [127 Cal.Rptr.2d 252] [medical group that provided utilization review service was a health care provider within the meaning of § 425.13]; *Community Care & Rehabilitation Center v. Superior Court* (2000) 79 Cal.App.4th 787, 790 [94 Cal.Rptr.2d 343] [§ 425.13 applied to elder abuse action against convalescent hospital].) Having determined that writ review is available, we turn now to a discussion of the merits of the trial court's orders.

## B.  Strict Products Liability Does Not Apply to Tissue Banks

We first consider the issue of whether the trial court erred in overruling Cryolife's demurrer to the strict liability cause of action. ██ The standard of review for an order overruling a demurrer is de novo. The reviewing court accepts as true all facts properly pleaded in the complaint in order to determine whether the demurrer should be overruled. (*Sierra-Bay Fed. Land Bank Assn. v. Superior Court* (1991) 227 Cal.App.3d 318, 327 [277 Cal.Rptr. 753].) ██ The court may also consider as grounds for a demurrer any matter that is judicially noticeable under Evidence Code sections 451 or 452. (Code. Civ. Proc., § 430.30, subd. (a).)[4] A general demurrer will lie where the complaint "has included allegations that *clearly* disclose some defense or bar to recovery." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2002) ¶ 7:49, pp. 7-24 to 7-25, italics in original.)

In the present case, Cryolife contends that the cause of action for strict liability is barred by the defense of a tissue bank's statutory immunity to strict products liability under section 1635.2, despite the allegations in plaintiff's complaint stating that Cryolife manufactures and sells a product. Whether strict products liability applies to a tissue bank that supplied an allegedly defective human tissue for surgical implantation is an issue no California appellate court has considered. In contrast, it is well established that strict products liability does not apply to blood banks or other institutions that provide blood transfusions and blood products. (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 272 [7 Cal.Rptr.2d 101]; *Hyland*

---

[4] Real party in interest requests judicial notice of the August 13, 2002, Food and Drug Administration Order for Retention, Recall and/or Destruction. This document was not part of the record below and is not judicially noticeable under Evidence Code sections 451 or 452. We therefore deny the request for judicial notice.

*Therapeutics v. Superior Court* (1985) 175 Cal.App.3d 509, 516 [220 Cal.Rptr. 590]; *Shepard v. Alexian Brothers Hosp., supra,* 33 Cal.App.3d at pp. 613–614.) In enacting section 1606, California, like many other states, enacted a "blood shield law" that provides immunity from strict liability claims.[5]

California's blood shield law, section 1606, provides in pertinent part that "[t]he procurement, processing, distribution, or use of whole blood, plasma, blood products, and blood derivatives for the purpose of injecting or transfusing the same, or any of them, into the human body shall be construed to be, and is declared to be, for all purposes whatsoever, the rendition of a service by each and every person, firm, or corporation participating therein ...." The rationale for the blood shield law is that the supplying of blood by a hospital to a patient is "merely incidental" to the services rendered by the hospital. (*Shepard v. Alexian Brothers Hosp., supra,* 33 Cal.App.3d at p. 610.) Also, the public policy in favor of promoting an adequate supply of blood militates against liability in the absence of negligence or intentional misconduct. (*Id.* at pp. 611–613.)

However, plaintiff argues that the Legislature has not enacted a similar shield law for tissue banks, and he emphasizes that the Health and Safety Code provision regarding tissue banks, section 1635.2, is phrased differently than section 1606, the blood shield law. Section 1635.2 provides, "The Legislature hereby declares its intent that the collection, processing, storage, or distribution of tissue for the purpose of transplantation, as regulated by this chapter, shall be deemed a service by those persons engaged in these activities. Therefore, the collection, processing, storage, or distribution of tissue for the purpose of transplantation, as regulated by this chapter, shall not be subject to the requirements of Division 2 (commencing with Section 2101) of the Commercial Code."

Plaintiff contends that the omission in section 1635.2 of any language indicating that a tissue bank shall be deemed to provide a service "for all purposes," combined with the reference to the Commercial Code, indicates that the Legislature did not intend to immunize tissue banks from strict

---

[5] Other states with blood shield laws include, among others, Alaska (Alaska Stat. § 45.02.316) (*Roe v. Miles Laboratories, Inc.* (D.Alaska 1989) 740 F.Supp. 740, 741–742); Colorado (Colo. Rev. Stat. § 13-22-104 (1973)) (*St. Luke's Hospital v. Schmaltz* (1975) 188 Colo. 353, 356–357 [534 P.2d 781]); Connecticut (Conn.Gen.Stat. § 19a-280) (*Coffee v. Cutter Biological* (2nd Cir. 1987) 809 F.2d 191, 193); Hawaii (Haw. Rev. Stat. § 327-51(1985)) (*Smith v. Cutter Biological, Inc., a Div. of Miles Inc.* (1991) 72 Haw. 416, 423 [823 P.2d 717]); Minnesota (Minn.Stat. § 525.921) (*Doe v. Travenol Laboratories, Inc.* (D.Minn. 1988) 698 F.Supp. 780, 782); Pennsylvania (42 Pa. Cons. Stat. § 8333) (*Flynn v. Langfitt* (E.D.Pa. 1989) 710 F.Supp. 150, 151); and Tennessee (Tenn. Code Ann. § 47-2-316) (*McDaniel v. Baptist Memorial Hospital* (1972) 352 F.Supp. 690, 691).

products liability and, instead, intended only to prevent application of the Commercial Code provisions for commercial sales. We do not find this argument persuasive, for several reasons.

■ First, section 1635.2 expressly provides that the collection, processing and storage of human tissue for transplantation "shall be deemed a service." The statute is unequivocal in its plain language, placing no limits on the circumstances in which a tissue bank will be deemed to have provided a service. Accordingly, we must follow the principle of statutory construction that "if statutory language is 'clear and unambiguous there is no need for construction, and courts should not indulge in it.' " (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 218 [188 Cal.Rptr. 115, 655 P.2d 317].) Section 1635.2 clearly and unambiguously provides that tissue banks provide a service for all purposes, despite the omission of the specific phrase "for all purposes" from its language.

Moreover, the inclusion of language pertaining to the Commercial Code does not change the plain meaning of section 1635.2. Rather, the reference to the inapplicability of "Division 2 (commencing with Section 2101) of the Commercial Code" further demonstrates the Legislature's intent to categorize a tissue bank regulated under the Health and Safety Code as a service provider. Division 2 of the Commercial Code concerns the sale of goods, including warranties. (Com. Code, §§ 2313–2316.) "[T]he liability imposed by strict liability in tort and breach of express and implied warranties is virtually the same, i.e., a form of liability without fault." (*Shepard v. Alexian Brothers Hosp.*, *supra*, 33 Cal.App.3d at p. 615.) Therefore, by expressly excluding the application of the sales and warranty provisions of the Commercial Code to "the collection, processing, storage, or distribution of tissue for the purpose of transplantation," (§ 1635.2) the Legislature implicitly excluded such tissue-related activities from the application of the doctrine of strict liability.

Second, other statutory provisions also demonstrate the Legislature's broad intent that the provision of human tissue not be considered a sale of goods or products. The Uniform Anatomical Gift Act provides, "A person may not knowingly, for valuable consideration, purchase or sell a part for transplantation, therapy, or reconditioning, if removal of the part is intended to occur after the death of the decedent." (§ 7155, subd. (a); see *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 160, fn. 5 [271 Cal.Rptr. 146, 793 P.2d 479].) However, payment for tissue-related services is allowed, including "the removal, processing, disposal, preservation, quality control, storage, transplantation, or implantation of a part." (§ 7155, subd. (b).) The Penal Code also provides that it is unlawful to knowingly sell human tissue (excluding plasma and sperm) for purposes of transplantation. (Pen. Code, § 367f, subd. (c)(1).)

Third, we are guided by the analysis of the California Supreme Court in *Murphy v. E.R. Squibb & Sons, Inc.* (1985) 40 Cal.3d 672 [221 Cal.Rptr. 447, 710 P.2d 247], regarding a similar issue. In that case, the issue was whether a pharmacy where an allegedly defective drug was purchased could be held strictly liable for the alleged defects. The court concluded that a pharmacy had statutory immunity from strict liability pursuant to former Business and Professions Code section 4046, which provided that the profession of pharmacy was a "dynamic patient-oriented health service."[6] The California Supreme Court concluded that this statutory provision provided pharmacies with immunity from strict liability similar to the immunity provided by the blood shield law, section 1606, despite the difference in the language of the two statutes.

The court acknowledged that "[i]t is true that section 1606 of the Health and Safety Code provides not only that the distribution and use of blood and blood plasma is a service, but also that they should be deemed not to constitute a sale, whereas [former] section 4046, subdivision (b), does not expressly declare that a sale is not involved in the practice of pharmacy." (*Murphy v. E.R. Squibb & Sons, Inc., supra,* 40 Cal.3d at p. 680.) However, the court determined that when the Legislature enacted former Business and Professions Code section 4046, it must have known that a pharmacist's primary role was to fill prescriptions for medications sold to the public. For that reason, "[t]he Legislature must have intended ... that even though a pharmacist is paid for the medication he dispenses, his conduct in filling a prescription is to be deemed a service, and, like the manufacturer of blood plasma, a pharmacy is immune from strict liability." (*Murphy v. E.R. Squibb & Sons, Inc., supra,* 40 Cal.3d at p. 680.)

We similarly conclude that, despite the difference in the language of section 1606 and section 1635.2, section 1635.2 provides statutory immunity from strict liability to tissue banks subject to regulation under the Health and Safety Code. When the Legislature enacted section 1635.2 in 1991 as part of a regulatory scheme for tissue banks,[7] it had to know that tissue banks are paid for their activities in connection with providing human cadaver tissue for medical use. By expressly deeming such activities to constitute a service, the Legislature must have intended a tissue bank to be immune from strict liability, just like a pharmacy.

Our conclusion is in accord with other authorities. In *Condos v. Musculoskeletal Transplant Foundation* (D.Utah 2002) 208 F.Supp.2d 1226,

---

[6] Former Business and Professions Code section 4046, added by Statutes 1955, chapter 551, section 2, page 1056, repealed by Statutes 1996, chapter 890, section 2, page 3954. See Business and Professions Code section 4050, subdivision (b), added by Statutes 1996, chapter 890, section 3, page 3961, derived from former section 4046.

[7] Section 1635 et seq., added by Statutes 1991, chapter 801, section 2, pages 3571–3577.

1230, the federal district court ruled for several reasons that donated human bone tissue used to repair the plaintiff's spine was not a product subject to strict products liability. First, the district court determined that no court had applied strict liability to the distribution of human tissue. (*Id.* at p. 1229.) Second, the district court found significant Utah's adoption of the Restatement (Third) of Torts, section 19, which states that blood and human tissue are excluded from strict products liability.[8] The district court noted, "This is consistent with a general policy throughout the nation, as observed by the American Law Institute, against applying strict liability to the distribution of human tissue." (*Condos v. Musculoskeletal Transplant Foundation, supra,* 208 F.Supp.2d at p. 1230.)

Third, the district court in *Condos v. Musculoskeletal Transplant Foundation* found the intent of the Utah State Legislature that the distribution of human tissue be considered a service was demonstrated by the Legislature's adoption of the Uniform Anatomical Gift Act, which prohibited the sale of human tissue for valuable consideration, as well as the Legislature's enactment of a blood shield law. (*Condos v. Musculoskeletal Transplant Foundation, supra,* 208 F.Supp.2d at p. 1230.) The Utah blood shield law recognized that "medical transfusions and transplants are essentially medical services, even though a tangible item is involved in the process." (*Ibid.*) Accordingly, the district court concluded, "human bone tissue is not a 'product' subject to products liability law, and [the] distribution of human tissue, including reasonable payments for related services, does not constitute a 'sale' for purposes of strict liability." (*Ibid.*)

Finally, we see no reason that the public policy rationale for exempting blood products from strict liability should not also apply to human tissue products, such as the allograft at issue in the case at bar. This court has previously stated, "In our view there is a legitimate state interest in manufactured blood products. We concur in the perception that 'legislatures have determined that the production and use of human blood *and its derivatives* for therapeutic purposes should be encouraged; and for this purpose those who provide these products, and who are themselves free from fault, should not be required to bear the economic loss which might otherwise be imposed under the rules of strict liability which are applicable to sellers of commercial products generally.' " (*Hyland Therapeutics v. Superior Court, supra,* 175

---

[8] Restatement of Torts (Third) section 19 provides, "For purposes of this Restatement: [¶] (a) A product is tangible personal property distributed commercially for use or consumption. Other items, such as real property and electricity, are products when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property that it is appropriate to apply the rules stated in this Restatement. [¶] (b) Services, even when provided commercially, are not products. [¶] (c) Human blood and human tissue, even when provided commercially, are not subject to the rules of this Restatement." (Rest. 3d Torts, Products Liability, § 19.)

Cal.App.3d at p. 516.) The California statutory provisions we have discussed reflect a similar legitimate state interest in human tissue products used for therapeutic purposes.

For these reasons, our de novo review shows that the first amended complaint on its face discloses the defense of statutory immunity under section 1635.2 to the cause of action for strict liability, and we therefore conclude that the trial court erred in overruling Cryolife's demurrer to that cause of action.

### C.  *Cryolife is a Health Care Provider Under Section 425.13*

We next consider the second issue of first impression raised in this writ proceeding: whether a tissue bank is a health care provider within the meaning of section 425.13. "[W]henever an injured party seeks punitive damages for an injury that is directly related to the professional services provided by a health care provider acting in its capacity as such, then the action is one 'arising out of the professional negligence of a health care provider,' and the party must comply with section 425.13[, subdivision] (a)." (*Central Pathology Service Medical Clinic, Inc. v. Superior Court* (1992) 3 Cal.4th 181, 191–192 [10 Cal.Rptr.2d 208, 832 P.2d 924].) The legislative intent in enacting section 425.13 was to provide a pretrial hurdle to punitive damages claims against health care providers: "Following the enactment of MICRA in 1975, the Legislature added section 425.13 in 1987 due to related policy concerns ' "that unsubstantiated claims for punitive damages were being included in complaints against health care providers." ' [Citations.] The effect of section 425.13 is to add additional protections against such claims, ' "by establishing a pretrial hearing mechanism by which the court would determine whether an action for punitive damages could proceed." [Citation.]' " (*Palmer v. Superior Court, supra,* 103 Cal.App.4th at p. 961.)

The standard of review for an order on a motion to strike punitive damages allegations is de novo. (*Clauson v. Superior Court* (1998) 67 Cal.App.4th 1253, 1255 [79 Cal.Rptr.2d 747].) "In passing on the correctness of a ruling on a motion to strike, judges read allegations of a pleading subject to a motion to strike as a whole, all parts in their context, and assume their truth." (*Ibid.*) In the present case, we are concerned with the specific issue of whether section 425.13 bars plaintiff's punitive damages claim. "To determine what actions require compliance with the pleadings procedure of section 425.13, the courts will look to whether 'the injury for which damages are sought is directly related to the professional services provided by the health care provider.' " (*Palmer v. Superior Court, supra,* 103 Cal.App.4th at pp. 961–962.)

Cryolife contends that section 425.13 applies to plaintiff's punitive damages claim because it is a health care provider within the meaning of the statute, and therefore the trial court erred in denying Cryolife's motion to strike the punitive damages allegations despite plaintiff's failure to comply with the procedural requirements of section 425.13. Plaintiff, on the other hand, argues that section 425.13 is not applicable because his claim for punitive damages is predicated solely on "Cryolife's strict product liability for its defective allograft product," and is not related to professional services. We reject plaintiff' s argument in accordance with our ruling above that Cryolife cannot be held liable for strict products liability. As we have discussed, as a matter of law Cryolife provides licensed tissue bank services, not a product. The first amended complaint therefore discloses on its face that plaintiff's claims arise from Cryolife's provision of professional services.

Alternatively, plaintiff contends that section 425.13 does not apply because Cryolife is not a health care provider within the meaning of the statute. This is the more difficult question to resolve. Subdivision (b) of section 425.13 defines a "health care provider" as including "any clinic, health dispensary, or health facility licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code." No appellate court has addressed the issue of whether a tissue bank, such as Cryolife, is a health care provider within the meaning of section 425.13. It is undisputed that a tissue bank is licensed under Division 2 of the Health and Safety Code,[9] but is not a clinic or health facility. Therefore, the key question is whether Cryolife qualifies for protection under section 425.13 as a health dispensary.

Cryolife relies upon the decision in *Coe v. Superior Court, supra,* 220 Cal.App.3d at page 53, which ruled that a blood bank is a " 'health dispensary' " within the meaning of the MICRA statutes that use that term. The court in *Coe* construed the term " 'health dispensary,' " which has no statutory definition, to include blood banks because "a blood bank dispenses a product and provides a service inextricably identified with the health of humans." (*Ibid.*) Also, the court reasoned that the inclusion of blood banks in the category of health care providers protected by MICRA "is entirely consistent with the legislative purpose in enacting MICRA which was to provide a remedy for the health care crisis attributable to malpractice premium costs." (*Ibid.*)

Based on the reasoning in *Coe v. Superior Court,* another appellate court ruled that a sperm bank is a health care provider within the meaning of

---

[9] Section 1635.1, subdivision (a), provides that "every tissue bank operating in California on or after July 1, 1992, shall have a current and valid tissue bank license issued or renewed by the state department pursuant to Section 1639.2 or 1639.3," with certain exceptions not relevant here.

section 425.13 because it qualifies as a health dispensary. (*Johnson v. Superior Court* (2002) 101 Cal.App.4th 869, 883 [124 Cal.Rptr.2d 650].) In *Johnson v. Superior Court*, parents and their minor child brought a medical malpractice action against a sperm bank, alleging that the child had inherited a kidney disease from the sperm donor and the sperm bank had failed to disclose that the sperm came from a donor with a history of kidney disease. The court considered the issue of whether the plaintiffs were required to bring a motion under section 425.13 for leave to amend the complaint to include a claim for punitive damages. (*Johnson v. Superior Court, supra,* 101 Cal.App.4th at p. 879.)

In ruling that a motion was required, the court in *Johnson v. Superior Court* determined that the definition of "health dispensary" for purposes of MICRA also applied to the phrase as used in section 425.13, because the statutes have similar legislative goals. On that basis, the court found that a sperm bank was a health dispensary within the meaning of section 425.13 because the sperm bank "dispenses a product (sperm), and provides a service (provision of donor sperm to health care practitioners and their clients)" that is " 'inextricably identified with the health of humans.' " (*Johnson v. Superior Court, supra,* 101 Cal.App.4th at p. 881.)

At first glance, these decisions appear to be problematical because they state that blood banks and sperm banks provide products as well as professional services. However, the use of the word "product" is not an obstacle to applying the *Coe/Johnson* definition of health dispensary to a tissue bank. We reiterate that pursuant to statute the providers of blood and tissue products are deemed to provide a service. However, plaintiff raises an issue not considered in *Coe* or *Johnson*: whether "health dispensary" should be given the dictionary definition of "dispensary": "a place where medicine or medical or dental treatment is dispensed," which would appear to exclude tissue banks. (Merriam-Webster's Collegiate Dict. (10th ed. 1999) p. 335.)

We cannot agree that the phrase "health dispensary" as used in section 425.13 must be restricted to the dictionary definition of "dispensary," which, according to Merriam-Webster's Collegiate Dictionary, originated in 1699. Human tissue transplantation and related tissue bank services are, of course, recent innovations in medical care not known in the 17th century. Nevertheless, a tissue bank does "dispense" (prepare and distribute) human tissue for transplantation, and in that sense qualifies under a broader definition of dispensary.[10] Moreover, as the court in *Johnson v. Superior Court* reasoned, there is a legislative basis for finding that the services of a tissue bank in dispensing human tissue are inextricably identified with the health of humans. The Legislature recognized that the tissue bank industry had the power to

---

[10] Merriam-Webster's Collegiate Dictionary, *supra,* at page 335.

affect human health when it enacted the statutory scheme for regulating tissue banks, section 1635 et seq. (*Johnson v. Superior Court, supra,* 101 Cal.App.4th at p. 882.)

■ Thus, a tissue bank is a health dispensary within the meaning of section 425.13 because it dispenses human tissue for transplantation and provides tissue-related services that are identified with human health. For that reason, and because plaintiff's claims arise from Cryolife's tissue-related services, we conclude that plaintiff's punitive damages claim against Cryolife is subject to the procedural requirements of section 425.13. Therefore, the trial court erred in denying Cryolife's motion to strike the punitive damages allegations. This result is consistent with the policy rationale of section 425.13, which was enacted "to ensure that health care providers would not be embroiled in frivolous litigation that would affect their ability to continue to provide medical services to meet the health care needs of Californians." (*Johnson v. Superior Court, supra,* 101 Cal.App.4th at p. 879.) By protecting tissue banks from sham punitive damages claims, as well as from strict products liability, the Legislature has fostered the public interest in the availability of donor tissue for medical purposes.

## IV.  DISPOSITION

Let a peremptory writ of mandate issue directing respondent court to (1) vacate its order overruling Cryolife's demurrer to the cause of action for strict liability and to enter a new order sustaining the demurrer without leave to amend; and (2) vacate its order denying Cryolife's motion to strike the punitive damages of the first amended complaint, and to enter a new order granting the motion. The temporary stay order is vacated. Each party shall bear its own costs in this original proceeding.

Elia, J., and Wunderlich, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied October 22, 2003. Baxter, J., did not participate therein.