Filed 3/7/16  New Peking Buffet v. Lin CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| NEW PEKING BUFFET, INC., | B258842 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC494420) |
| v. | |
| SHENG LI LIN et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Michael M. Johnson, Judge.  Affirmed.

Ellis Law Group, Mark E. Ellis, Ronald R. Poirier and Steven T. Kelly for Plaintiff and Appellant.

Bryan Cave, John W. Amberg and Jonathan G. Fetterly for Defendants and Respondents.

_____

New Peking Buffet, Inc. (New Peking), an Illinois corporation whose principal place of business is in Los Angeles County, challenges a judgment of dismissal entered after the trial court sustained the demurrer of defendants Sheng Li Lin, Jin Xing Yang, Kiat Yeung, Xue Hua Zheng, Xiao Xia Ling (collectively Respondents), Ding He Chen, and Jin Bin Chen without leave to amend the second amended complaint (SAC). New Peking did not appeal the judgment in favor of defendants Ding He Chen and Jin Ben Chen (collectively the Chens). New Peking argues the court erred in finding the act of state doctrine barred its claims.[1] We disagree and affirm.

## BACKGROUND

According to New Peking's SAC,[2] in 2002 the government of the People's Republic of China (PRC) was looking for foreign investors to develop land in Jingdezhen City, Jiangxi Province, into an industrial park (the Jingdezhen project). The Chens, Chinese citizens, learned of this project and approached Tony Chen,[3] an American citizen and president and sole owner of New Peking, with this investment opportunity. New Peking claims Tony Chen and the Chens entered into an oral joint venture agreement to pursue investing in the Jingdezhen project. The terms of their oral agreement, allegedly, were for (1) New Peking to act as the foreign investor, (2) New Peking to raise the capital necessary for an initial investment, and (3) the parties to equally share in the profits, after New Peking's initial capital investment was repaid. New Peking alleges Tony Chen and

---

[1] "The judicially created act of state doctrine precludes the courts of this country from inquiring into the validity of governmental acts of a recognized foreign sovereign committed within its own territory." (Black's Law Dict. (6th ed. 1990) p. 34, col. 1; see, e.g., *Banco Nacional de Cuba v. Sabbatino* (1964) 376 U.S. 398, 400–401 [84 S.Ct. 923] (*Banco Nacional*).)

[2] When reviewing a demurrer, we "accept[] as true all facts properly pleaded in the complaint in order to determine whether the demurrer should be overruled." (*Cryolife, Inc. v. Superior Court* (2003) 110 Cal.App.4th 1145, 1152.)

[3] It is unclear what relationship, if any, Ding He Chen and Jin Bin Chen have to Tony Chen, and the parties did not explain the relationship, if any.

all the defendants[4] later orally further agreed to (1) sell the individual buildings developed for the Jingdezhen project and (2) reinvest the profits from the buildings' sales back into the Jingdezhen project, minus New Peking's initial capital contribution, which was to be repaid. New Peking, and "investors," then created Jiangxi Shengdu Zhi Yei Company Ltd. (Shengdu), a Chinese corporation, to manage the Jingdezhen project. On September 24, 2002, after an application process through the Ministry of Commerce (MOFCOM), a branch of the PRC (the Administration for Industry and Commerce of Jingdezhen City) issued Shengdu a business license, which listed New Peking as Shengdu's sole owner.[5]

As agreed, New Peking raised capital and invested $5 million into the Jingdezhen project. Under New Peking's version of events, at some unspecified time after the project began, the defendants conspired to breach the joint venture agreement between Tony Chen and the Chens and divert the Jingdezhen project's profits to themselves, without repaying New Peking's initial investment or reinvesting the profits. To accomplish this, the defendants conspired to steal New Peking's corporate records and official seal in order to falsify documents necessary to fraudulently induce the PRC to transfer ownership of Shengdu from New Peking to the defendants. New Peking alleges sometime in 2011 or 2012, at the direction of defendants, Ding He Chen traveled to Los Angeles and stole New Peking's records and seal. After obtaining the records and seal, the defendants used them to fraudulently induce the PRC to transfer ownership of Shengdu to defendant and respondent Kiat Yeung (Yeung). With the power of this new

---

[4] "Defendants" refers to Respondents and the Chens, the parties sued as defendants below.

[5] We may properly consider allegations from prior pleadings that are omitted from a later pleading when the allegations are omitted to conceal a flaw. (*Vallejo Development Co. v. Beck Development Co.* (1994) 24 Cal.App.4th 929, 946.) In its later pleadings, New Peking characterized an official Chinese document evidencing its ownership of Shengdu merely as a "stock certificate." As the trial court recognized, however, a "previous demurrer established that the 'stock certificate'" was really "a business certificate/license issued by the PRC through its [wholly foreign-owned enterprise] laws and procedures."

3

ownership, the defendants then misappropriated funds from Shengdu to themselves in violation of the joint venture agreement.

On October 24, 2012, New Peking sued the defendants for conversion, fraud, and negligence.**6** The defendants filed a motion for judgment on the pleadings. In response, New Peking submitted a first amended complaint (FAC). In the FAC, New Peking abandoned its original causes of action and instead pleaded three new causes: (1) declaratory relief, (2) accounting, and (3) violation of California's Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.). On October 9, 2013, the court granted the defendants' motion for judgment on the pleadings with leave to amend, recognizing the already submitted FAC as filed in response to the grant of leave to amend.

On November 8, 2013, the defendants filed a demurrer to the FAC. The defendants claimed each cause of action in the FAC was barred by the act of state doctrine. The court sustained the demurrer with leave to amend, ruling that the causes of action, as pleaded, were barred by the act of state doctrine. On April 1, 2014, New Peking filed its SAC, asserting the FAC's three causes of action (declaratory relief, accounting, and violation of the UCL) and adding a fourth: breach of contract and breach of the implied covenant of good faith and fair dealing. Once again, the defendants demurred, in part, under the act of state doctrine. This time, the court sustained the demurrer without leave to amend, invoking the act of state doctrine for all four counts. The court did not grant leave to amend because New Peking "has had three opportunities to allege sufficient causes of action, and there appears to be no reasonable probability that [New Peking] can do so. *E.g.*, *Sprinkles v. Associated Indemnity* (2010) 188 Cal.App.4th 69, 76. Leave to amend should not be granted when amendment of the complaint would

---

**6** According to the record, New Peking had previously filed an administrative complaint in China in December 2011 against the "Bureau of Investment Promotion and Cooperation of Jingdezhen City," the "Administration for Industry and Commerce of Jingdezhen City," and Yeung, requesting that the governing body revoke the approval of the transfer of shares and ownership of Shengdu. The record does not reveal the outcome of this administrative proceeding, but the record does show that Chinese authorities arrested and detained the Chens.

4

be futile. *Long v. Century Indemnity* (2008) 163 Cal.App.4th 1460, 1468; *Vaillette v. Fireman's Fund* (1993) 18 Cal.App.4th 680, 685." New Peking appealed.[7]

## DISCUSSION

On appeal, New Peking argues the trial court erred in sustaining the defendants' demurrer because New Peking's claims were not barred by the act of state doctrine and it pleaded sufficient facts to support the complaint. We disagree.

We review the sustaining of a demurrer de novo. (*Martin v. Bridgeport Community Assn., Inc.* (2009) 173 Cal.App.4th 1024, 1031.) That is, we determine "whether, as a matter of law, the complaint states facts sufficient to constitute a cause of action." (*Ibid*.) In addition to considering the facts, we "may also consider . . . any matter that is judicially noticeable under Evidence Code section . . . 452," including the PRC's laws and regulations. (*Cryolife, Inc. v. Superior Court*, *supra*, 110 Cal.App.4th at p. 1152.) "A judgment of dismissal after a demurrer has been sustained without leave to amend will be affirmed if proper on any grounds stated in the demurrer, whether or not the court acted on that ground." (*Carmon v. Alvord* (1982) 31 Cal.3d 318, 324.) We do not consider whether New Peking will be able to prove its allegations at trial, but New Peking has the burden of proving the court below erred in sustaining the demurrer. (*Ferrick v. Santa Clara University* (2014) 231 Cal.App.4th 1337, 1341; *Vaughn v. LJ Internat., Inc.* (2009) 174 Cal.App.4th 213, 219.)

We review the decision denying leave to amend for abuse of discretion. (*Dey v. Continental Central Credit* (2008) 170 Cal.App.4th 721, 725–726; accord, *Buller v. Sutter Health* (2008) 160 Cal.App.4th 981, 985–986.) A plaintiff establishes an abuse of discretion by showing it can effectively amend the complaint, consistent with its theory of the case. (*Dey*, at p. 731.)

---

[7] Tony Chen and Kurt Miller, plaintiffs below, are not parties to this appeal.

5

**I.    The act of state doctrine bars relief for all of New Peking's causes of action, as they were pleaded**

The act of state doctrine prevents courts from assessing the validity of a foreign government's official acts made in its sovereign capacity. (*Kirkpatrick Co. v. Environmental Tectonics Corp.* (1990) 493 U.S. 400, 409 [110 S.Ct. 701, 707] (*Kirkpatrick*).) That is, "'courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.'" (*In re Philippine Nat'l. Bank* (9th Cir. 2005) 397 F.3d 768, 772, quoting *Underhill v. Hernandez* (1897) 168 U.S. 250, 252 [18 S.Ct. 83].) Under the act of state doctrine, we are to presume other countries' official acts are valid. (*Kirkpatrick*, at p. 409.) This deference has constitutional separation of power underpinnings and prevents the judiciary from improperly interfering with the executive's domain of foreign relations. (*Kirkpatrick*, at pp. 404–405, citing *Banco Nacional*, *supra*, 376 U.S. at p. 423.)

Not every act of state is afforded deference under the act of state doctrine, however. (*Kirkpatrick*, *supra*, 493 U.S. at p. 409.) For example, and of importance here, mere ministerial official acts do not render a case nonjusticiable. (See *ibid.* [courts ordinarily have the obligation to exercise their jurisdiction].) Ministerial acts are generally those in which the state actor "'"is left no choice of his own"'" and is merely executing "a set task." (*Johnson v. State of California* (1968) 69 Cal.2d 782, 788 [rejecting definitively defining "ministerial" but quoting *Morgan v. County of Yuba* (1964) 230 Cal.App.2d 938, 942, as an example of how "ministerial" is commonly understood]; *Ne Casek v. City of Los Angeles* (1965) 233 Cal.App.2d 131, 134–135 [executing "a set task"].) In contrast, acts of state which require "'"personal deliberation, decision and judgment"'" are not ministerial and represent decisive state action. (*Johnson*, at p. 788.) Using these general definitions, the kinds of state action the United States Supreme Court has protected under the act of state doctrine have been deliberative. (See, e.g., *Underhill v. Hernandez*, *supra*, 168 U.S. 250 [refusal to grant a passport];

6

*Oetjen v. Central Leather Co.* (1918) 246 U.S. 297 [38 S.Ct. 309] [confiscation of hides]; *Kirkpatrick*, *supra*, 493 U.S. 400 [issuance of military contract].) These actions are the kind which "'constitute an exercise of governmental administration'" and "'should "'remain beyond the range of judicial inquiry'"'" because ""'judicial review . . . would place the court in the unseemly position of determining the propriety of decisions expressly entrusted to a coordinate branch of government."'" (*Masters v. San Bernardino County Employees Retirement Assn.* (1995) 32 Cal.App.4th 30, 45–46, quoting *Johnson*, at pp. 793–794.)

The PRC's act of approving the transfer of Shengdu's ownership from New Peking to Yeung was deliberative, not ministerial, and is therefore presumed valid under the act of state doctrine. Under the PRC's laws and regulations,[8] a party petitioning for change in corporate ownership must go through the same process necessary to establish a corporate entity. (PRC, Law on Wholly Foreign-Owned Enterprises, Standing Com. Nat. People's Cong. (Oct. 31, 2000) art. 10 <http://english.mofcom.gov.cn/aarticle/lawsdata/chineselaw/200301/20030100062858.html> [as of Mar. 2, 2016].) The corporate approval process requires more than the PRC's ministerial "rubber-stamping" of applications. It instead requires, for example, submission of documents containing information on the "amount of environmental pollution likely to [be] caused and [the] corresponding measures for solution"; "capital construction and capital, resources and raw materials required for production and operations and supply measures"; the "personnel framework, arrangements for employee recruitment, training, wages, welfare benefits, insurance, labor protection"; and the "main types of production equipment to be used and respective age of equipment, production technology, level of technology and source of supply." (PRC, Detailed Rules for Implementation of Law on Wholly Foreign-Owned Enterprises, State Council (Apr. 12, 2001) art. 14 <http://english.mofcom.gov.cn/aarticle/lawsdata/chineselaw/200301/20030100062868.html> [as of

---

[8] We take judicial notice under Evidence Code section 452 of the PRC's relevant laws and regulations.

Mar. 2, 2016].) Applicants must also submit documents establishing articles of association and a "feasibility study report." (*Id*., art. 10.) These documents must be "examined and approved" by various "departments of the State." (Regs. of the PRC, Admin. of Co. Registration, State Council (Dec. 18, 2005) art. 22 <http://tradeinservices. mofcom.gov.cn/en/b/2005-12-18/17120.shtml> [as of Mar. 2, 2016].) Without this approval, a corporate entity cannot exist in the PRC. (*Id*., art. 25.)

This kind of action is not merely a matter of the PRC's paper recognition of a change in corporate ownership as New Peking argues. Rather, it is the result of a complex, deliberative process, indicating a choice on the PRC's part to allow Shengdu to operate within its jurisdiction. California courts should not be placed in a position of judging the validity of such an act by the PRC or one of its constituent parts. (*Kirkpatrick*, *supra*, 493 U.S. at p. 409.) If New Peking believes the PRC was fraudulently induced into transferring ownership of Shengdu from New Peking to Yeung, causing it to suffer damages, it needs to petition the appropriate Chinese authorities to redress that harm. (See *In re Philippine Nat'l. Bank*, *supra*, 397 F.3d at p. 772.)

It is possible New Peking could have argued that regardless of who owned Shengdu, Respondents violated Tony Chen and the Chens's oral joint venture agreement, which Respondents were parties to by their ratification, by diverting funds from the Jingdezhen project to themselves. This would have allowed New Peking, at a minimum, to seek an accounting and damages for breach of contract without questioning the validity of the PRC's transfer of Shengdu to Yeung; such a pleading would question only whether Respondents had misappropriated funds from New Peking through Shengdu, regardless of who owned Shengdu. New Peking, however, did not plead its causes of action by arguing ownership of Shengdu was irrelevant. In fact, each cause of action mentioned and was tied to the transfer of ownership in Shengdu.

To start, New Peking requested a "Declaration of Plaintiff NPB's ownership interest and rights in Shengdu, specifically an order confirming that NPB is the legal owner of one hundred percent of Shengdu's outstanding shares of stock." Next, in the accounting cause of action, New Peking states, "NPB and the Defendants disagree as to

8

the control of and ownership interest in Shengdu." Due in part to the allegedly fraudulent transfer, New Peking requested an accounting to determine whether and, if so, how much defendants owed New Peking. In the breach of contract and breach of the covenant of good faith and fair dealing cause of action, New Peking alleges defendants "wrongfully transferred ownership in Shengdu from NPB to themselves." New Peking argued defendants' fraudulently induced transfer was part of a series of events which constituted a breach of the joint venture agreement. Finally, under its UCL cause of action, New Peking alleged, "Defendants' scheme of transferring the ownership of Shengdu," in conjunction with other actions, constituted a violation of the UCL, and that "Defendants' conduct" also "constitutes unfair competition resulting from Defendants' ongoing wrongful misappropriation and conversion of the ownership of Shengdu from NPB to Defendants." Although each cause of action mentioned other wrongs, including Respondents' failure to return New Peking's initial capital contribution and distribute the Jingdezhen project's profits equally, each cause of action was also squarely premised on the allegedly wrongful transfer of Shengdu. Allowing the trial court to adjudicate the causes of action based in part upon the assumption or recognition that Shengdu was fraudulently transferred would violate the act of state doctrine.

New Peking also failed to propose on appeal an amendment to the pleadings that would not require the court to pass judgment on the PRC's transfer of Shengdu. Instead, it argued the act of state did not apply because the PRC's act was ministerial or, in the alternative, the "commercial exception" applied. Under either scenario, New Peking is admitting that the transfer of Shengdu required some government action. As described above, based on the PRC's approval process, the PRC's level of state action was significant enough to invoke the act of state doctrine; as described below, the commercial exception does not apply.

As a defense to the application of the act of state doctrine, New Peking argues that the parties' actions fell under the "commercial dispute" exception. The commercial dispute exception, however, applies when a sovereign acts in a commercial capacity, not when the parties act in a commercial capacity. (*Alfred Dunhill of London, Inc. v.*

9

*Republic of Cuba* (1976) 425 U.S. 682, 695 [96 S.Ct. 1854].)  That is, "the concept of an act of state should not be extended to include the repudiation of a purely commercial obligation owed *by* a foreign sovereign or by one of its commercial instrumentalities." (*Id*., italics added.)  Here, the PRC was not acting in a commercial capacity, even though its approval of Shengdu through MOFCOM related to commercial matters.[9]  Instead, it was acting in its sovereign administrative and regulatory capacities, to which the act of state applies.  (*Banco Nacional*, *supra*, 376 U.S. 398, 445, fn. 3 (dis. opn. of White, J.) ["'The expression "act of State" usually denotes "an executive or administrative exercise of sovereign power"'"].)  Therefore, the commercial dispute exception does not bar application of the act of state doctrine here.

## II.    New Peking did not allege sufficient facts to show Respondents ratified the joint venture agreement

New Peking argues that if one of the causes of action were barred by the act of state doctrine, the other causes of action could still be adjudicated.  Although the cases New Peking cites are from other jurisdictions and therefore not binding, we agree that even if a claim is barred by the act of state doctrine, other properly pleaded claims are not barred if they are severable.  (*Sun 'n Sand, Inc. v. United California Bank* (1978) 21 Cal.3d 671, 703 [allowing certain causes of action, but not others, to survive a demurrer].)  The trial court nevertheless properly sustained the demurrer as to all of New Peking's causes of action, however, because New Peking failed to state sufficient supporting facts.

---

[9] In *OBB Personenverkehr AG v. Sachs* (2015) ___ U.S. ___ [136 S.Ct. 390], the Supreme Court held that a railroad operated by Austria could not be hauled into an American court as a defendant in a personal injury case under the commercial exception doctrine of the Foreign Sovereign Immunities Act.  This decision represents the Court's continuing commitment to respect the sovereignty of foreign governments and the need for American citizens to redress harms done by foreign governments within those governments' jurisdiction, even when the governments' actions have some relationship to or bearing on commercial activity.

## A. Breach of contract and of the covenant of good faith and fair dealing and declaration of conclusions premised on the breach

New Peking argues Respondents breached their contractual duties to New Peking under an alleged oral joint venture agreement. In the SAC under a section entitled, "General Allegations," however, New Peking admits that Tony Chen, on behalf of New Peking, initially entered into the oral joint venture agreement with only the Chens, who are not parties to this appeal. Their agreement was "for the purpose of investing in, financing, and managing the Chinese development project" and they were to "share equally [in] the profits after return of paid in capital." New Peking does not allege Respondents were involved in this initial agreement and it appears from the SAC that, of Respondents, only Sheng Li Lin (Lin) and Jin Xing Yang (Yang) became involved at this time when they joined Shengdu's board. New Peking does not allege that Lin or Yang even knew of the joint venture agreement allegedly agreed to by Tony Chen and the Chens when they joined Shengdu's board, let alone agreed with it or became parties to it. Lin's and Yang's board membership after the formation of the alleged joint venture agreement is insufficient alone to demonstrate they knew of or ratified that agreement. Nor does New Peking allege when the board was formed the other Respondents knew of the joint venture agreement or became parties to it. In fact, New Peking does not describe the relationship between Xue Hua Zheng (Zheng) and Xiao Xia Ling (Ling) to New Peking or Shengdu at all in the SAC.[10] If Zheng and Ling were not parties to the joint venture agreement, were not Shengdu board members, and never initially or eventually had an interest in Shengdu, it is unclear how they were involved with New Peking, Shengdu, or the Jingdezhen Project. These facts do not allege Respondents were parties to the joint venture agreement.

---

[10] In the FAC, New Peking originally alleged that Defendants, not only the Chens, had become aware of the Jingdezhen project and it was Defendants, not only the Chens, who entered into the original joint venture agreement with New Peking. We do not consider these allegations, which connect Respondents to the joint venture agreement, however, because New Peking omitted them in the SAC.

11

Other subsequent language regarding the agreement is confusing at best, and fails to coherently allege facts demonstrating Respondents were parties to it. For example, New Peking also alleged that, after the formation of Shengdu, it "and all of the Defendants subsequently agreed that the parties would sell off each building of the development project upon its completion. The parties further agreed that initially any profits from the sale of the individual units would be reinvested in the project. However, it was agreed the initial capital contributions would be repaid earlier." New Peking makes no mention of the joint venture in this allegation. New Peking then alleged, "Following the commencement of the project and contrary to their prior agreement, . . . Defendants . . . decided to pay themselves out of the project, even prior to the completion of the project, *and* in derogation of the joint venture agreement." (Italics added.) New Peking's allegations make it sound as if the alleged "subsequent" agreement between New Peking and Defendants was separate from the joint venture agreement; if this were true, it would confirm that Respondents were, indeed, not parties to the joint venture agreement.

Adding confusion to the nature of the agreement, if any, between Respondents and New Peking, under a section entitled, "Third Cause of Action for Breach of Contract and of the Covenant of Good Faith and Fair Dealing," New Peking again admits that the original joint venture agreement was made by New Peking, acting through Tony Chen, and the Chens; again, Respondents are not mentioned as being part of this agreement. New Peking then specifically states: "*Defendants Din He Chen[] and Jin Bin Chen have breached the agreement* by depriving NPB of the expected benefits of the bargain by wrongfully usurping the interest previously held by NPB in Shengdu, by preventing it from being reimbursed for some or all of the initial seed money contributed, and by preventing it from sharing in the profits, which . . . Plaintiff NPB believes *the other Defendants have siphoned from the corporate opportunity*, and wrongfully divided among themselves." (Italics added.) Much like the general allegation language, this language, again, makes it appear as if New Peking concedes that Respondents were not parties to the joint venture agreement.

12

Without explaining how or when Respondents became parties to the joint venture agreement, New Peking states in the next paragraph of the breach of contract cause of action: "Under this contract, the Defendants owed a duty to do all the things necessary to ensure that NPB was reimbursed for its seed money and was able to share in the profits. As part of the agreement, Defendants were subject to the implied covenant of good faith and fair dealing which obligated them to act in all ways which would not frustrate NPB's rights to receive the benefits of the agreement." Without specific facts alleging how Respondents became parties to the alleged joint venture agreement, New Peking's statements that Respondents owed them a duty under it are conclusory and insufficient to establish the necessary contractual relationship giving rise to remediable breaches of duties.

New Peking again perpetuates the confusion by alleging that "[b]y the acts described above, Defendants Din He Chen, Jin Bin Chen, and the other Defendants *in aiding and abetting* them, have deprived NPB of the benefits of the agreement and have frustrated and interfered with the purpose of the agreement." (Italics added.) To the extent the clause refers to Respondents' alleged ratification of the original joint venture agreement, it still does not describe how Respondents became parties to the joint venture agreement and, in fact, again, makes it sound as if Respondents were not parties to the joint venture agreement and their subsequent actions merely assisted *the Chens* in breaching *their* joint venture agreement. The use of the phrase "*the* agreement" also suggests New Peking entered into only one agreement, and that agreement was with the Chens. (Italics added.)

New Peking tries to avoid these defects by alleging in a conclusory fashion "that at all times mentioned herein Defendants, individually and jointly acted as the agents, employees, partners, principles, representatives and/or affiliates of each of the remaining Defendants and were, at all times herein mentioned, acting within the course and scope of such relationship . . . . [E]ach of the Defendants did confirm, consent to, affirm, direct, authorize, acknowledge, and ratify the acts of each and every of the Defendants herein." Such boilerplate language, even in conjunction with conclusory allegations such as

13

Respondents "aided and abetted" the Chens, fails to provide sufficient specific facts to show Respondents were parties to the joint venture agreement, knew of it, ratified it, or breached it. (See, e.g., *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 134, fn. 12 (*Moore*).)[11] Because "[s]pecific factual allegations modify and limit consistent general statements" (*B & P Development Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 953), an absence of any specific facts supporting a boilerplate general statement may be construed as the general statement lacking any factual basis. We will not assume such a bare conclusion of law is true, and we therefore disregard this allegation. (*Moore*, at p. 125 [conclusions of law are not assumed as fact].)

Although it is possible New Peking could have alleged its facts and pleaded its causes of action to support a theory that Respondents and New Peking were parties to a joint venture agreement and Respondents breached the agreement, it did not. New Peking has had three opportunities to plead such facts and three opportunities to comprehensibly amend its pleadings, but failed to do so. We will not construe New Peking's pleadings to marshal potential facts and craft coherent arguments to support an agreement and breach theory.

Without an underlying contractual obligation, Respondents could not breach any contractual obligations to New Peking or violate the duty of good faith and fair dealing. Likewise, Respondents cannot be declared to have any contractual duties to an agreement

---

**11** In *Moore,* the court found the certain "secondary-liability allegations," similar to New Peking's ratification allegations, as "egregious examples of generic boilerplate." (51 Cal.3d at p. 134, fn. 12.) The language stated: "'each of the defendants was the agent, joint venturer and employee of each of the other remaining defendants, and is jointly liable for the acts of every other defendant and in doing the things hereinafter alleged, each was acting within the course and scope of said agency, employment, partnership and joint venture with the advance knowledge, acquiescence or subsequent ratification of each and every remaining defendant, and that each defendant joined together with every other defendant . . . had a fiduciary duty to the plaintiff, and each acted in concert with every other defendant in violating their [*sic*] duties to plaintiff.'" (*Ibid*.) The court noted that "[n]owhere in the third amended complaint does Moore specifically allege that any defendant other than Golde knew that Moore had not received adequate disclosures." (*Ibid*.)

to which they were not parties. (See *Racine & Laramie, Ltd. v. Department of Parks & Recreation* (1992) 11 Cal.App.4th 1026, 1031 ["The implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation"].)

## B.     Violation of the UCL

New Peking alleged three wrongs under the UCL: (1) fraudulent transfer of Shengdu's ownership, (2) failure to pay back New Peking's initial capital contribution, and (3) failure to distribute New Peking's share of the project's profits. All of these wrongs, however, are either barred by the act of state doctrine or tied to an agreement New Peking did not sufficiently plead. To start, and again, ruling on whether Respondents fraudulently transferred Shengdu's ownership would require a California court to pass judgment on the validity of the PRC's transfer of Shengdu's ownership. For the reasons discussed above, California courts are prevented from doing so by the act of state doctrine. As to Respondents' failure to return New Peking's initial capital contribution or distribute the Jingdezhen project's profits to New Peking, again, New Peking did not plead sufficient facts to demonstrate that Respondents were parties to the joint venture agreement; therefore, without the underlying contractual agreement, New Peking cannot show Respondents owed it any duties.

## III.    Accounting

New Peking also asks the court to order an accounting of Shengdu's finances because "NPB and the Defendants disagree as to the control of and ownership interest in Shengdu, including what amount should be paid to each of the parties upon the dissolution of Shengdu," and "NPB is entitled to know whether funds exist so it may be reimbursed its initial contribution as agreed to by the parties, and whether or not profits exist which should have been distributed to NPB, but for the wrongful acts, fraud and conversion of these profits by the Defendants for their own purposes."

Based on the grounds it presented, New Peking's request for an accounting is unwarranted. To the extent that an accounting rests on the grounds of Shengdu's fraudulent transfer, we may not allow an accounting under the act of state doctrine. To the extent it rests on the grounds of Respondents' alleged agreement with Tony Chen,

15

New Peking failed to allege sufficient facts to demonstrate Respondents joined the agreement. In light of the fact that there are no justiciable issues against Respondents, an accounting claim cannot proceed.

## IV. Conclusion

The court did not abuse its discretion by denying leave to amend. New Peking submitted three complaints where all the causes of actions were barred by the act of state doctrine or failed to coherently show Respondents were parties to the joint venture agreement. New Peking did not argue on appeal it could amend the SAC to state viable causes of action. In light of this, we agree with the trial court that granting further leave to amend would be "'futile.'" (*Long v. Century Indemnity Co.*, *supra*, 163 Cal.App.4th at p. 1468; *Vaillette v. Fireman's Fund Ins. Co.*, *supra*, 18 Cal.App.4th at p. 685.)

## DISPOSITION

The judgment is affirmed. Respondents are awarded their costs on appeal under California Rules of Court, rule 8.278.

NOT TO BE PUBLISHED.


LUI, J.


We concur:


ROTHSCHILD, P. J.


JOHNSON, J.


16